[No. A114016. First Dist., Div. Five. Sept. 10, 2008.]

FOROUGH NADAF-RAHROV, Plaintiff and Appellant, v. THE NEIMAN MARCUS GROUP, INC., et al., Defendants and Respondents.

COUNSEL

Robert L. Rusky; Law Offices of Daniel Ray Bacon, Daniel Ray Bacon and Aaron S. Gorfein for Plaintiff and Appellant.

Keller Grover, Eric A. Grover; Littler Mendelson, AnnaMary E. Gannon and Sofija Verzich for Defendants and Respondents.

OPINION

**REARDON, J.**[*]—Plaintiff, Forough Nadaf-Rahrov, appeals from the granting of summary judgment in favor of defendants on her various claims of employment discrimination. We reverse in part.

## FACTUAL HISTORY

Forough Nadaf-Rahrov began working as a clothes fitter for The Neiman Marcus Group, Inc. (Neiman Marcus), in Dallas, Texas, in April 1985. In the mid-1990's, she transferred to a fitter position in the San Francisco store. Between 1997 and 2003, Nadaf-Rahrov had recurrent problems with back and joint pain. Dr. Joel M. Klompus, her treating physician, informed Neiman Marcus that Nadaf-Rahrov needed various accommodations, including time off work and a shortened work week, which Neiman Marcus provided. In December 2002, Dr. Klompus informed Neiman Marcus that Nadaf-Rahrov had carpal tunnel syndrome in both hands and osteoarthritis in her fingers.

---

[*]Judge of the Alameda Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

On November 7, 2003, Nadaf-Rahrov requested family medical leave for about one month. Dr. Klompus signed a "Certification of Health Care Provider," which described her condition as pain in multiple joints, including the back, ankles, shoulders, and fingers. He wrote that the condition commenced in about July 2003 and the probable duration of the disability was until January 10, 2004. In response to the question "[I]s the employee unable to perform work of any kind?" Dr. Klompus responded "yes." When asked to list the essential functions of the job that Nadaf-Rahrov was unable to perform, he wrote "all." Neiman Marcus granted Nadaf-Rahrov family medical leave until December 10, 2003.[1]

Dr. Klompus extended Nadaf-Rahrov's leave in December 2003, in January 2004, and in February 2004. His medical notes stated that Nadaf-Rahrov was "unable to work" or "unable to return to work" and the extensions lasted through March 5, 2004.

In a letter dated January 21, 2004, Nadaf-Rahrov informed Neiman-Marcus that she could not return to her fitter job due to her disability, and she asked to be assigned to another position at Neiman Marcus. Dr. Klompus wrote Neiman Marcus a similar letter on January 25, confirming Nadaf-Rahrov's disability and recommending she be reassigned to a position "that would not involve bending, standing, or kneeling."

Neiman Marcus's San Francisco Human Resource Manager Kelly Butler averred that the January 2004 letters from Nadaf-Rahrov and her physician, "[P]rompted me to enter into an extended dialogue with Ms. Nadaf-Rahrov regarding her qualifications, restrictions and available positions within [Neiman Marcus]. I had multiple telephone conversations with Ms. Nadaf-Rahrov regarding her restrictions and the fact that, according to her and her doctor's notes, she was completely prohibited from performing work of *any kind*. I repeatedly told Ms. Nadaf-Rahrov . . . that I would be happy to assist her in exploring other opportunities within [Neiman Marcus] as soon as her restrictions were modified to allow her to perform some work in some capacity, as without a release there was no point in discussing available positions because she was not qualified for anything. Ms. Nadaf-Rahrov assured me that she wanted to return to [Neiman Marcus] and that she would inform me if, and when, her doctor modified her restrictions so that we could explore her

---

[1] On November 12, 2003, Nadaf-Rahrov applied for state disability benefits and Dr. Klompus prepared a supporting medical certificate. Nadaf-Rahrov received disability benefits as a result of this claim throughout 2004.

options." Nadaf-Rahrov acknowledged in her deposition that Butler told her that she should call when she was released to return to work so that Butler could look for other jobs in the store for her, and she acknowledged that she had agreed to do so.

In a letter dated February 16, 2004, Butler wrote to Nadaf-Rahrov, "Your FMLA approved leave is exhausted as of February 1, 2004. Your latest doctor's note indicates that you are unable to return to work prior to March 5, 2004. We are no longer able to hold your position open. Business needs dictate that we must make some staffing changes. You agreed to contact me when you are released to return to work so that we can assist you in exploring other opportunities within the store. [¶] . . . With proper medical updates, your sick pay benefits will continue unchanged until you are able to return to work, or your sick benefit hours are exhausted. If your situation changes and you are able to return to work prior to March 5, 2004, please get in touch with me so we can plan for your return."

In a letter dated February 24, 2004, Nadaf-Rahrov acknowledged receipt of Butler's February 16 letter and wrote, "According to my physician and specialists through examinations, I need to still be under their care for a little while longer before I can return to work. [¶] . . . I will be looking forward to contact you as soon as my physician let me know I can release from his care."

Dr. Klompus extended Nadaf-Rahrov's medical leave four more times through August 16, 2004. The March 1, 2004 extension said she "is under my care for joint and back problems. She needs to remain on disability for at least [two] months." The May 4, 2004 extension said she "is continuing under my medical care. She has a return appointment to see me in 6 weeks and will remain on medication for her condition." The May 10, 2004 extension said she "remains under my medical treatment and is unable to work. She may return to work on 6/28/04." The June 28, 2004 extension stated, "Forough Nadaf remains unable to return to work as she is having increasing pain. I am extending her disability for an additional 6 weeks. I believe she may be able to return to work on 8/16/04 but not in her previous position."

On July 14, 2004, Neiman Marcus terminated Nadaf-Rahrov, who by that time had exhausted her remaining sick and vacation benefits. Butler averred, "At the time, she did not have a release from her doctor to perform work of any kind. Even with a release, I concluded that given her existing (and continuing) restrictions, she was not qualified to fill any open and available position within [Neiman Marcus]. Moreover, Ms. Nadaf-Rahrov utterly failed

to provide me with any reason to believe that her condition was likely to change anytime in the near future. In fact, our conversations and correspondence (or the lack thereof) lead [*sic*] me to believe just the opposite."

Nadaf-Rahrov did not receive any notice that she was going to be terminated. When she received the letter informing her she had been terminated, she was shocked and called Kayko Humphrey, the secretary in the human resources department. Humphrey simply told her the termination was a human resource decision.

## PROCEDURAL HISTORY

On January 12, 2005, Nadaf-Rahrov sued Neiman Marcus for employment discrimination based on disability, national origin, and ethnicity in violation of the California Fair Employment and Housing Act, Government Code section 12940 et seq. (FEHA);[2] for retaliation in violation of the FEHA; and for wrongful termination in violation of public policy.[3] She also sued Butler and Humphrey for retaliation. She later dismissed her claim against Humphrey.

The court granted summary judgment to Neiman Marcus and Butler on March 24, 2006, and entered judgment. The court wrote that Nadaf-Rahrov could not prevail on her claims for disability discrimination, failure to accommodate, and failure to engage in the interactive process because the undisputed facts established that she was not able to perform the essential functions of her fitter position or any other available position at Neiman Marcus. Neiman Marcus reasonably accommodated Nadaf-Rahrov by providing six months of leave beyond the requirements of the Family and Medical Leave Act of 1993 (FMLA) and it was not required to wait indefinitely for her medical condition to improve to the point where she could perform an available job. The court ruled in defendants' favor on the retaliation claim because the termination decision was not unlawful and thus could not be retaliatory and because Nadaf-Rahrov was not a qualified individual with a disability. Moreover, there was no evidence that Butler acted with a retaliatory motive. The court ruled in defendants' favor on the national origin and

---

[2] All statutory references are to the Government Code unless otherwise indicated.

[3] Nadaf-Rahrov also sued Neiman Marcus for age discrimination, violation of Labor Code section 132a, and related claims for wrongful termination in violation of the public policy. She does not challenge the trial court grant of summary adjudication to Neiman Marcus on the age discrimination claims, so we do not discuss it further. The Labor Code section 132a claims settled while this appeal was pending and Nadaf-Rahrov has abandoned her arguments with respect to those claims.

ethnicity discrimination claim because Nadaf-Rahrov failed to establish a prima facie case and failed to present admissible evidence to dispute defendants' evidence that their conduct was not discriminatory.

## DISCUSSION

Summary judgment is appropriate "if all the papers submitted show that there is no triable issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." (Code Civ. Proc., § 437c, subd. (c).) "There is a triable issue of material fact if, and only if, the evidence would allow a reasonable trier of fact to find the underlying fact in favor of the party opposing the motion in accordance with the applicable standard of proof." (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 850 [107 Cal.Rptr.2d 841, 24 P.3d 493], fn. omitted (*Aguilar*).)

We review summary judgment orders de novo. (*Aguilar, supra*, 25 Cal.4th at p. 860.) We do not resolve conflicts in the evidence as if we were sitting as the trier of fact. (*Id.* at p. 856.) Instead, we draw all reasonable inferences from the evidence in the light most favorable to the party opposing summary judgment. (*Id.* at p. 843.) All doubts as to the propriety of granting summary judgment are resolved in favor of the opposing party. (*Saffro v. Elite Racing, Inc.* (2002) 98 Cal.App.4th 173, 178 [119 Cal.Rptr.2d 497].)

### I. *Disability Discrimination*

Three "unlawful employment practices" prohibited by the FEHA are relevant to Nadaf-Rahrov's "disability discrimination claim." Section 12940, subdivision (a) (section 12940(a)) declares it an unlawful employment practice for an employer "because of the . . . physical disability . . . of any person . . . to bar or to discharge the person from employment . . . or to discriminate against the person in compensation or in terms, conditions, or privileges of employment. [¶] (1) This part does not prohibit an employer from . . . discharging an employee with a physical or mental disability . . . where the employee, because of his or her physical or mental disability, is unable to perform his or her essential duties even with reasonable accommodations . . . ." (§ 12940(a), (a)(1).) Section 12940, subdivision (m) (section 12940(m)) declares it an unlawful employment practice for an employer "to fail to make reasonable accommodation for the known physical or mental disability of an applicant or employee." Finally, section 12940, subdivision (n) (section 12940(n)) declares it an unlawful employment practice for an employer "to fail to engage in a timely, good faith, interactive process with

the employee or applicant to determine effective reasonable accommodations, if any, in response to a request for reasonable accommodation by an employee or applicant with a known physical or mental disability or known medical condition."

Nadaf-Rahrov's first cause of action for disability discrimination alleges all three of these unlawful employment practices. She expressly alleges violations of section 12940(m), and 12940(n). Although she does not expressly allege a violation of section 12940(a), she alleges that Neiman Marcus's "termination of Plaintiff's work assignment" as well as its refusal to accommodate her violated section 12940. Section 12940(a) prohibits terminations of qualified employees because of disability.

## A. *Section 12940(a)*

■ Section 12940(a) prohibits employers from discharging an employee because of a physical disability. In order to prevail on a discriminatory discharge claim under section 12940(a), an employee bears the burden of showing (1) that he or she was discharged because of a disability, and (2) that he or she could perform the essential functions of the job with or without accommodation (in the parlance of the Americans with Disabilities Act of 1990 (ADA), 42 U.S.C. § 12101 et seq., that he or she is a qualified individual with a disability). (*Green v. State of California* (2007) 42 Cal.4th 254, 257–258 [64 Cal.Rptr.3d 390, 165 P.3d 118] (*Green*).)

Although Nadaf-Rahrov bears the burden of proving these elements at trial, in the summary judgment context the moving party bears the burden of demonstrating there are no material triable issues of fact and that it is entitled to judgment as a matter of law. A defendant moving for summary judgment can prevail if it shows "that one or more elements of the [plaintiff's] cause of action . . . cannot be established, or that there is a complete defense to that cause of action. Once the defendant or cross-defendant has met that burden, the burden shifts to the plaintiff or cross-complainant to show that a triable issue of one or more material facts exists as to that cause of action or a defense thereto." (Code Civ. Proc., § 437c, subd. (p)(2); see also *Aguilar, supra,* 25 Cal.4th at p. 845.) "[F]rom commencement to conclusion, the party moving for summary judgment bears the burden of persuasion that there is no triable issue of material fact and that he is entitled to judgment as a matter of law." (*Aguilar,* at p. 850.) Neiman Marcus sought summary judgment on the

ground that Nadaf-Rahrov could not establish her claims. It bore the initial burden of showing that she could not establish one or more of the elements of her causes of action and the ultimate burden of proving there are no triable issues of fact as to her causes of action.

On the first element of the section 12940(a) claim, Neiman Marcus does not contend that Nadaf-Rahrov cannot establish that she was discharged because of her disability. Butler averred that Nadaf-Rahrov was terminated because she "did not have a release from her doctor to perform work of any kind" and "given her existing (and continuing) restrictions, she was not qualified to fill any open and available position," nor did she "provide me with any reason to believe that her condition was likely to change anytime in the near future." In other words, Nadaf-Rahrov was fired because Butler believed her disability prevented her from performing the essential functions of any available position in the company.

Summary adjudication of the section 12940(a) claim, therefore, turns on the second element of the claim: whether Nadaf-Rahrov could perform the essential functions of the relevant job with or without accommodation. Nadaf-Rahrov does not dispute that she was unable to perform the essential functions of her *former* position as a clothes fitter with or without accommodation. Under federal law, however, when an employee seeks accommodation by being reassigned to a vacant position in the company, the employee satisfies the "qualified individual with a disability" requirement by showing he or she can perform the essential functions of the *vacant position* with or without accommodation. (*Aka v. Washington Hosp. Center* (D.C. Cir. 1998) 332 U.S. App.D.C. 256 [156 F.3d 1284, 1300–1301] (*Aka*) [in bank]; *Smith v. Midland Brake, Inc.* (10th Cir. 1999) 180 F.3d 1154, 1161–1162 (*Midland Brake*) [in bank; listing cases]; *Taylor v. Phoenixville School Dist.* (3d Cir. 1999) 184 F.3d 296, 317–318 (*Phoenixville*); *Fjellestad v. Pizza Hut of America, Inc.* (8th Cir. 1999) 188 F.3d 944, 950–951 (*Fjellestad*).) The position must exist and be vacant, and the employer need not promote the disabled employee. (*Spitzer v. Good Guys, Inc.* (2000) 80 Cal.App.4th 1376, 1389 [96 Cal.Rptr.2d 236] (*Spitzer*); *Midland Brake*, at pp. 1174–1178 [reviewing cases].) We apply the same rule here. To prevail on summary adjudication of the section 12940(a) claim, Neiman Marcus must show there is no triable issue of fact about Nadaf-Rahrov's ability, with or without accommodation, to perform the essential functions of an available vacant position that would not be a promotion.

To establish that Nadaf-Rahrov cannot establish this fact, Neiman Marcus relies on three types of evidence. First, it relies on Dr. Klompus's statement in November 2003 that Nadaf-Rahrov was not able to perform any work and the alleged absence of any notification thereafter that Nadaf-Rahrov could perform some kind of work or would be able to do so in the foreseeable future. Second, it relies on Nadaf-Rahrov's description of her own physical condition, which it argues demonstrates she was unable to perform any work whatsoever and there was no reasonable likelihood she would be able to do so in the foreseeable future. Third, it relies on Butler's professional opinion, based on her familiarity with the job requirements of available vacant positions, that Nadaf-Rahrov could not perform the essential functions of those jobs. Neiman Marcus also cites admissions by Nadaf-Rahrov during her depositions to bolster this third argument. We address each argument in turn.

### 1. Dr. Klompus's Medical Certification

In November 2003, Dr. Klompus completed a Certification of Health Care Provider in support of Nadaf-Rahrov's application for family medical leave. He wrote that Nadaf-Rahrov suffered from pain in multiple joints, especially her back, ankles, shoulders and fingers, requiring multiple visits and adjustment of therapies. She was presently incapacitated and the duration of her condition would depend on her response to treatment—"will know by 1/04." On the form, Dr. Klompus responded "yes" to all three of the following questions: "Will it be necessary for the employee to take work only intermittently or to work on a less than full schedule as a result of the condition (including for treatment . . .)?"; "If medical leave is required for the employee's absence from work because of the employee's own condition (including absences due to pregnancy or a chronic condition), is the employee unable to perform work of any kind?"; and "If able to perform some work, is the employee unable to perform any one or more of the essential functions of the employee's job (the employee or the employer should supply you with information about the essential job functions)?" In connection with the last question, Dr. Klompus responded "all" to the supplemental question, "If yes, please list the essential functions the employee is unable to perform."

Neiman Marcus zeroes in on Dr. Klompus's response to the second question, which indicated that Nadaf-Rahrov was "unable to perform work of any kind" as of November 2003. Butler avers, "At no time after November 2003, when I received Plaintiff's 'Certificate of Health Care Provider' that

stated that Ms. Nadaf-Rahrov was '. . . unable to perform work of *any* kind . . .' was I told anything by anyone to make me think that this restriction had been modified or was no longer in effect."[4] She relied in part on this evidence to opine that Nadaf-Rahrov was unable to perform the essential functions of any open and available position at the time of her termination and that there was no reason to believe that she would be able to do so in the foreseeable future.

Nadaf-Rahrov, however, has raised a triable issue of fact about whether Dr. Klompus's medical certification and notes established that she was unable to perform work of any kind at the time of her termination or in the foreseeable future. Dr. Klompus averred that he intended the Certification of Health Care Provider to indicate only that Nadaf-Rahrov was unable to perform the essential functions of her job as a fitter. Dr. Klompus further averred that he encouraged Nadaf-Rahrov to seek other work at Neiman Marcus that "did not have the strenuous physical requirements of a fitter"; that Nadaf-Rahrov wrote her January 21, 2004 letter to Neiman Marcus after consulting with him; that as stated in Nadaf-Rahrov's letter he was willing to "discuss other options to accommodate her in order for her to continue working at [Neiman Marcus] in another position"; and that he intended his own January 25, 2004 letter to indicate that Nadaf-Rahrov could perform other work at Neiman Marcus. Dr. Klompus's January 25, 2004 letter stated that he "would strongly support her change to a position that would not involve bending, standing, or kneeling." Dr. Klompus's subsequent medical notes dicated that Nadaf-Rahrov was to remain on disability, was to continue under medical care, or was "unable to work." Dr. Klompus averred that he had "always maintained that [Nadaf-Rahrov] was capable of performing other jobs that did not require the strenuous tasks of a fitter and all of my references to her not being able to work referred only to her job as a fitter . . . ." He averred that he did not release Nadaf-Rahrov to work "because I believed that she could not continue to perform the job of a fitter. Neiman Marcus never offered any other positions for her in order for me to evaluate whether she could be released to those jobs."

In light of Dr. Klompus's averments, the medical certifications and notes in the record do not alone establish as a matter of law that Nadaf-Rahrov was unable to perform work of any kind at the time of her termination or in the

---

[4] This averment is relevant not only to the question of whether Nadaf-Rahrov was *in fact* able to perform any work after November 2003, the issue we are currently considering, but also to the question of whether Neiman Marcus was responsible for a breakdown in the interactive process. We consider the second issue later in this opinion when we review summary adjudication of Nadaf-Rahrov's section 12940(n) claim.

foreseeable future. A reasonable fact finder could find that the Certification of Health Care Provider included overstatements and that the 2004 medical notes indicated she could not work as a fitter but might be able to work in another position if it did not involve more than incidental bending, kneeling, and standing.

The trial court ruled Dr. Klompus's declaration, "which contains conclusions, many of which are directly contrary to his statements in the November 2003 Health Care Certification and the subsequent notes he submitted to [Neiman Marcus] in 2004, is largely inadmissible because it lacks an adequate foundation and is speculative." This ruling was an abuse of discretion. (See *People ex rel. Lockyer v. Sun Pacific Farming Co.* (2000) 77 Cal.App.4th 619, 639–640 [92 Cal.Rptr.2d 115] [evidentiary rulings are reviewed for abuse of discretion].) Dr. Klompus had a foundation for his opinion because, as Nadaf-Rahrov's treating physician, he was intimately familiar with her physical restrictions. He could reasonably provide a preliminary opinion about her ability to perform certain types of work based on his lay understanding of those common jobs. Moreover, as the author of the Certification of Health Care Provider and 2004 medical notes, he had direct personal knowledge of what he intended by those writings.

### 2. *Nadaf-Rahrov's Testimony Regarding Her Physical Condition*

Nadaf-Rahrov testified during her August 2005 deposition that she was still so severely physically disabled that she was unable to perform most ordinary household chores or activities of daily living. She had pain in her knee and low back that went through her spine to her shoulders and her neck on a daily basis. The pain was constant and would increase with physical activity. She had difficulty sleeping because her hands went numb at night and she had to get up and move them around. She could not hold the phone for long and had a hard time having even short phone calls. Her husband did most of the cooking, washed the dishes, vacuumed the house, did the laundry, made the beds, and took Nadaf-Rahrov grocery shopping so he could push the cart and move the bags. Walking for five or 10 minutes caused Nadaf-Rahrov hip and low back pain. Nadaf-Rahrov had not worked for anyone since November 2003, and she had not even looked for work until July 2005, when she began to feel better after switching to a lower dose of steroids. She was also feeling stronger mentally. However, she still never knew how she would feel in the morning. She felt different every day. The doctors continued to advise her that as long as she felt pain she should not bend, lift, stoop, stand for too

long, or use her knees. The trial court concluded that Nadaf-Rahrov's "acknowledged and still ongoing physical problems prevented her from taking any open position."

Although these physical restrictions are substantial, they did not self-evidently prevent Nadaf-Rahrov from performing any work whatsoever *with or without accommodation.* The trial court wrote that it was "inconceivable to anyone who has ever eaten in a restaurant" that Nadaf-Rahrov could work as a busser or dishwasher given these physical limitations. In other words, no reasonable fact finder could find that she was able to perform those jobs given her physical limitations. We might agree with that conclusion, but we cannot conclude that no reasonable fact finder could find that Nadaf-Rahrov could perform *any* work with accommodation given her physical limitations. For example, the physical restrictions do not obviously preclude Nadaf-Rahrov from performing desk work with accommodation. As explained below, Nadaf-Rahrov raised a triable issue of fact about whether vacant desk jobs for which she was otherwise qualified were available. Therefore, the fact of her physical restrictions alone does not support summary adjudication of this cause of action.

### 3. *Evidence of Nadaf-Rahrov's Ability to Perform Specific Jobs*

Butler averred that in her professional opinion, Nadaf-Rahrov was not able to perform any of the following positions that were available between January 2004 and July 14, 2004: "bartender, busser, sous chef, building engineer, assistant human resource manager, loss prevention investigator, make-up artist, merchandise coordinator, restaurant coordinator, dishwasher, stock person, visual trimmer, waiter, sales department manager, and executive secretary." Butler described in detail the physical demands of and professional skills required for these positions as they are actually performed at Neiman Marcus, information that was within her personal knowledge as human resources manager of Neiman Marcus. Based on Nadaf-Rahrov's descriptions of her physical condition in conversations with Butler and in her deposition testimony, and based on Dr. Klompus's description of her physical condition in his communications with Neiman Marcus, Butler opined that Nadaf-Rahrov was unable to perform the physical demands of these positions. Based on Nadaf-Rahrov's employment application, which described her employment history, Butler further opined that Nadaf-Rahrov lacked the professional skills required for many of the positions. Neiman Marcus also

cites admissions Nadaf-Rahrov made during her deposition that she could not perform the physical tasks of many of these positions (bartender, busser, chef, building engineer, loss prevention officer, dishwasher, stock person, and waiter) as they were described to her by defense counsel. Those descriptions were consistent with Butler's descriptions of duties of these jobs in her declaration.

Nadaf-Rahrov, however, produced evidence that additional jobs were available at Neiman Marcus. Neiman Marcus responded to a discovery demand with a list of jobs available through November 2004 that included the following additional positions: clerical, cook, customer service representative, food preparation, gift wrapper, restaurant hostess, and sales. Jobs available during the extended time period are relevant because it may have been a reasonable accommodation for Neiman Marcus to extend Nadaf-Rahrov's leave of absence for a limited period of time until a position became available that Nadaf-Rahrov could perform, particularly if Neiman Marcus could have anticipated the future opening. (See *Hanson v. Lucky Stores, Inc.* (1999) 74 Cal.App.4th 215, 226 [87 Cal.Rptr.2d 487] [limited leave of absence may be reasonable accommodation].)

Nadaf-Rahrov also produced a declaration by Dr. Klompus opining that Nadaf-Rahrov could do several of these jobs because "they do not require kneeling and strenuous tasks with her fingers and hands which would affect her arthritic condition in the same manner as being a fitter." Specifically, he opined that Nadaf-Rahrov could work as a customer service representative, or clerical worker. As explained earlier, it is not self-evident from Nadaf-Rahrov's description of her physical restrictions that she could not perform desk jobs with accommodation. It is also not self-evident that she could not be accommodated in a hostess or sales position to avoid any need for prolonged standing. Although Dr. Klompus also opined that Nadaf-Rahrov could work as a busser, food preparer, dishwasher, or waiter—positions Nadaf-Rahrov essentially conceded she could not perform based on defense counsel's description of the jobs' duties—this conflict in the evidence does not render the rest of Dr. Klompus's declaration inadmissible or purely speculative. There is no indication in Dr. Klompus's declaration that he was provided the same job descriptions when he rendered his opinion. Moreover, an individual's tolerance for pain is subjective and a patient may decide he or she cannot perform work that a doctor opines he or she is technically physically capable of performing.

Nadaf-Rahrov also raised a triable issue of fact about her nonphysical qualifications for these positions. She had some past experience with office work and extensive experience with Neiman Marcus, having worked with the company since 1985. There is no evidence in the record that Neiman Marcus requires specific prior experience or skills for any of these positions.

Butler averred, "Of the open and available jobs, the only jobs that I considered even remotely near Ms. Nadaf-Rahrov's previous level of employment were: bartender, busser, dishwasher, waiter and stock person." By "previous level of employment," Butler apparently is indirectly referencing the rule that an employer has no obligation to accommodate a disabled employee by reassigning him or her to a vacant position that would amount to a promotion. (*Spitzer, supra,* 80 Cal.App.4th at p. 1389.) Butler does not explain what criteria she applied to determine which jobs were at or below Nadaf-Rahrov's previous level of employment. Nadaf-Rahrov, on the other hand, produced evidence of the pay rates of the various positions, which indicate that the clerical, customer service representative, and restaurant hostess positions pay *below* Nadaf-Rahrov's former pay range. The base rate for most of the sales positions was also below her former pay range. Nadaf-Rahrov has raised a triable issue about whether these positions would be promotions.

In sum, we conclude that Nadaf-Rahrov raised a triable issue of fact that she was unlawfully discharged because of her disability because Neiman Marcus could have but did not provide her with a reasonable accommodation (reassignment to a vacant position) that would have allowed her to continue working with the company. We reverse summary adjudication of the section 12940(a) claim.

### 4. *Discovery Ruling*

Because we reverse summary adjudication of the section 12940(a) claim, we address Nadaf-Rahrov's argument that the discovery commissioner erred in denying her motion to compel Neiman Marcus to provide a list of vacant jobs at all Neiman Marcus stores across the country since November 1, 2001. Neiman Marcus initially agreed to produce documents related only to job openings at the San Francisco store between November 7, 2003, and July 14, 2004. After the parties met and conferred about this discovery dispute, Neiman Marcus agreed to extend the time period of its response to November 7, 2004. Nadaf-Rahrov nevertheless filed a motion to compel a response to its full discovery demand, and a discovery commissioner granted the motion in

part. The commissioner extended the time period to November 1, 2005, and included job openings at the Dallas store. Nadaf-Rahrov argues the commissioner erred in not granting even broader discovery.

■ We review discovery rulings for abuse of discretion. (*Fisher v. Superior Court* (1986) 177 Cal.App.3d 779, 784 [223 Cal.Rptr. 203].) However, where a discovery motion is denied on the ground of relevancy based on an analysis of the substantive law governing the case, the appeal may raise a pure question of law. (See, e.g., *id.* at pp. 782, 784 [error to deny discovery where ruling was based on erroneous conclusion that defendant owed no duty to reasonably accommodate plaintiff's medical condition]; *Gile v. United Airlines, Inc.* (7th Cir. 1996) 95 F.3d 492, 499 (*Gile*) [error to deny discovery where ruling was based on erroneous conclusion that defendant's duty to accommodate plaintiff through reassignment only extended to positions in same department or positions to which she had previously requested a transfer].)

The reasoning behind the discovery commissioner's ruling is not in the record. In her moving papers, Nadaf-Rahrov cited federal case law to demonstrate that the discovery she sought was relevant to the lawsuit. These cases tend to demonstrate that an employer's duty to accommodate a disabled employee by reassigning him or her to a vacant position is not per se limited to vacant positions in the same workplace where the employee originally worked or to positions to which the employee expressly requested a transfer. (See, e.g., *Shapiro v. Township of Lakewood* (3d Cir. 2002) 292 F.3d 356, 360 [summary judgment improperly granted to employer on ground employee failed to request transfer to desired vacant position]; *Gile, supra,* 95 F.3d at p. 499 [discovery improperly limited to positions to which employee had requested a transfer]; *Buckingham v. U.S.* (9th Cir. 1993) 998 F.2d 735, 737, 740 [in summary judgment proceeding, court erred by concluding that job transfer to another city as accommodation was per se unreasonable].) Neiman Marcus responded to this argument primarily on the ground that it "ignores the fact plaintiff was not qualified to perform work of any nature, in any capacity, anywhere." Indeed, Nadaf-Rahrov's alleged inability to work at all was the main ground for Neiman Marcus's opposition to the motion to compel. Neiman Marcus, however, failed to establish her inability to work, and Nadaf-Rahrov sought the discovery precisely to establish there were jobs available within the company that she was able to perform despite her admittedly substantial physical restrictions. Denying the motion on this ground, therefore, would have been an abuse of discretion.

Neiman Marcus also argued that Nadaf-Rahrov failed to produce evidence that transfers among stores were routinely allowed, as she had stated in her moving papers. However, Neiman Marcus submitted evidence that it allowed inter-store transfers. Its argument over how liberal the transfer policy was (i.e., whether transfers were routinely allowed) should have been reserved for litigation of the merits of the action, not raised before the discovery commissioner.

Neiman Marcus also argued the discovery demand was unduly burdensome. However, in response to the demand for a list of vacant positions in the San Francisco store from November 2003 to November 2004, Neiman Marcus provided an 11-page computer printout, which hardly seems onerous even if it took some time to compile.

The critical issue on this motion to compel was the geographic scope of the discovery demand. Neiman Marcus only indirectly raised this issue in its opposition papers and only in the context of arguing it should not be compelled to produce any documents because Nadaf-Rahrov was unable to perform any work. We conclude that the commissioner did not abuse its discretion in refusing to compel discovery as to every vacant position at every Neiman Marcus store in the United States. Nadaf-Rahrov cites no authority that would support such a broad discovery order, nor does she aver that she would be willing to relocate anywhere in the country in order to obtain a new position with Neiman Marcus. On the other hand, limiting the order to the San Francisco and Dallas stores is unsupported by legal authority or by the arguments or evidence that were presented to the commissioner. Therefore, we reverse the order limiting discovery to those two stores as an abuse of discretion and remand the issue for reconsideration.

### B. *Section 12940(m)*

Section 12940(m) declares it an unlawful employment practice for an employer "to fail to make reasonable accommodation for the known physical or mental disability of an applicant or employee." We must determine whether a plaintiff must be able to perform the essential functions of a job with or without accommodation (i.e., must be a qualified individual with a disability) to prevail under section 12940(m) and, if so, who bears the burden of proving this fact.

#### 1. *Ability to Perform Essential Functions of Job*

Unlike section 12940(a), section 12940(m) does not expressly provide that an employer is not liable for "the refusal to employ or the discharge of an employee with a physical or mental disability, where the employee, because

of his or her physical or mental disability, is unable to perform his or her essential duties even with reasonable accommodations." (§ 12940(a)(1).) Similarly, unlike the ADA, section 12940(m) does not expressly limit the requirement to make reasonable accommodations to "qualified individual[s] with a disability." (42 U.S.C. § 12112(a), (b)(5)(A).)

In *Bagatti v. Department of Rehabilitation*, the Court of Appeal relied on these differences in statutory language to conclude that section 12940(m) "does not require that reasonable accommodation for disability be made only where the person is 'a qualified individual' able to perform the essential functions of the job . . . ." (*Bagatti v. Department of Rehabilitation* (2002) 97 Cal.App.4th 344, 360–361 & fn. 4 [118 Cal.Rptr.2d 443] (*Bagatti*); but see *Jensen v. Wells Fargo Bank* (2000) 85 Cal.App.4th 245, 256 [102 Cal.Rptr.2d 55] (*Jensen*) [holding a plaintiff suing for failure to accommodate under former § 12940, subd. (k), predecessor to § 12940(m), must establish he or she is a qualified individual able to perform the essential functions of the job]; *Brundage v. Hahn* (1997) 57 Cal.App.4th 228, 235, 239 [66 Cal.Rptr.2d 830] [construing former § 12940, subd. (k) in light of Equal Employment Opportunity Commission (EEOC) interpretive guidance, which implies employee must be able to perform essential functions of job to be entitled to accommodation].)[5] We disagree with *Bagatti* because it fails to fully grapple with the meaning of "reasonable accommodation" in section 12940(m).[6]

■ "Reasonable accommodation" is defined in the FEHA and its implementing regulations only by way of example.[7] (§ 12926, subd. (n); Cal. Code Regs., tit. 2, § 7293.9, subd. (a); see *Bagatti, supra*, 97 Cal.App.4th at

---

[5] See *Bagatti, supra*, 97 Cal.App.4th at pages 360–362, for discussion of *Brundage, supra*, 57 Cal.App.4th at page 239. In *Green*, the Supreme Court affirmed the holding of *Brundage*, but only as it applies to section 12940(a). (*Green, supra*, 42 Cal.4th at pp. 257–258.)

[6] In *Green*, the Supreme Court acknowledged the *Bagatti* holding in the context of discussing whether section 12940*(a)*, unambiguously conditioned liability on an employee's ability to perform the essential functions of a job with or without accommodation. (*Green, supra*, 42 Cal.4th at pp. 264–265.) The court wrote that *Bagatti* "provided little guidance on the qualification issue because it involved a cause of action for the failure to accommodate under section 12940, subdivision (m)." (*Id.* at p. 265.) The issue of whether a plaintiff must prove he or she is qualified to perform the essential functions of a job in order to prevail on a claim under section 12940(m) was not before the court in *Green*.

[7] Section 12926, subdivision (n) provides: " 'Reasonable accommodation' may include either of the following: [¶] (1) Making existing facilities used by employees readily accessible to, and usable by, individuals with disabilities. [¶] (2) Job restructuring, part-time or modified work schedules, reassignment to a vacant position, acquisition or modification of equipment or devices, adjustment or modifications of examinations, training materials or policies, the provision of qualified readers or interpreters, and other similar accommodations for individuals with disabilities."

pp. 354–356.) This definition is virtually identical to the ADA's statutory definition of the term, which is also by way of example. (42 U.S.C. § 12111(9); see also 29 C.F.R. § 1630.2(*o*)(2) (2008).)[8] Where a FEHA provision is modeled on an ADA provision, a federal regulation interpreting the ADA provision may be useful to guide construction of the FEHA provision. (*Bagatti, supra*, 97 Cal.App.4th at p. 358.)

A federal regulation provides the following relevant *descriptive* definition of "reasonable accommodation": "[m]odifications or adjustments to the work environment . . . *that enable a qualified individual with a disability to perform the essential functions of that position*." (29 C.F.R. § 1630.2(*o*)(1)(ii) (2008), italics added.) Moreover, the EEOC's interpretive guidance on the ADA makes clear that the duty to identify and provide a "reasonable accommodation" under the ADA is a duty to identify and provide accommodations that *enable the employee to perform the essential functions of the job held or desired.* (29 C.F.R. pt. 1630, app. (2008).)[9] The California Legislature

---

[8] Title 42 United States Code section 12111(9) provides: "The term 'reasonable accommodation' may include—[¶] (A) making existing facilities used by employees readily accessible to and usable by individuals with disabilities; and [¶] (B) job restructuring, part-time or modified work schedules, reassignment to a vacant position, acquisition or modification of equipment or devices, appropriate adjustment or modifications of examinations, training materials or policies, the provision of qualified readers or interpreters, and other similar accommodations for individuals with disabilities."

[9] The EEOC's "Interpretive Guidance on Title I of the Americans with Disabilities Act" describes the "Process of Determining the Appropriate Reasonable Accommodation" as follows: "Once a qualified individual with a disability has requested provision of a reasonable accommodation, the employer must make a reasonable effort to determine the appropriate accommodation. The appropriate reasonable accommodation is best determined through a flexible, interactive process that involves both the employer and the qualified individual with a disability. [The] process is described below in terms of accommodations that enable the individual with a disability to perform the essential functions of the position held or desired . . . . [¶] When a qualified individual with a disability has requested a reasonable accommodation to assist in the performance of a job, the employer, using a problem solving approach, should: [¶] (1) Analyze the particular job involved and determine its purpose and *essential functions*; [¶] (2) Consult with the individual with a disability to ascertain the precise job-related limitations imposed by the individual's disability and how those limitations could be overcome with a reasonable accommodation; [¶] (3) In consultation with the individual to be accommodated, *identify potential accommodations and assess the effectiveness each would have in enabling the individual to perform the essential functions of the position*; and [¶] (4) Consider the preference of the individual to be accommodated and select and implement the accommodation that is most appropriate for both the employee and the employer. . . . [¶] . . . [¶] This process requires the individual assessment of both the particular job at issue, and the specific physical or mental limitations of the particular individual in need of reasonable accommodation. With regard to assessment of the job, 'individual assessment' means analyzing the actual job duties and determining the true purpose or object of the job. *Such an assessment is necessary to ascertain which job functions are the essential functions that an accommodation must enable an individual with a disability to perform.* [¶] After assessing the relevant job, the employer, in consultation with the individual requesting the accommodation, *should make an assessment of the specific limitations imposed by the disability on the individual's*

has expressly affirmed the importance of the interactive process to identify reasonable accommodation "as this requirement has been articulated by the Equal Employment Opportunity Commission in its interpretive guidance of the [ADA]." (§ 12926.1, subd. (e).)

Because the California Legislature has modeled the reasonable accommodation requirements of section 12940(m) and section 12940(n) on the parallel federal requirements, the EEOC's definition of "reasonable accommodation" appropriately guides our construction of the state laws. Indeed, no competing definition of the term has come to our attention in researching this issue. Accordingly, we conclude that "reasonable accommodation" in the FEHA means (as relevant here) a modification or adjustment to the workplace that enables the employee to perform the essential functions of the job held or desired.

*Bagatti* held that the federal regulation defining "reasonable accommodation" should not guide construction of section 12940(m) because of the differences in the statutory language of section 12940(m) and its federal counterpart. (*Bagatti, supra*, 97 Cal.App.4th at pp. 360, 362, fn. 5.) The court reasoned that federal authority interpreting the ADA is not persuasive where the statutory language of the FEHA differs markedly from the ADA. (97 Cal.App.4th at pp. 361–362.) However, *Bagatti* overlooks the fact that section 12940(m) uses the same term as the ADA—"reasonable accommodation"— and the FEHA defines that term by way of example in language virtually identical to that used in the ADA. Neither the FEHA statute nor its regulations provide a descriptive definition of "reasonable accommodation" or in any way suggests that the term has a different meaning from the federal definition of the term. Indeed, we find it difficult to conceive of what a competing definition of "reasonable accommodation" would be. *Bagatti* ducks the question: "We recognize that this result will leave employers uncertain with respect to when they must provide reasonable accommodation to disabled employees. . . . Regulatory action to clarify employers' duties is plainly appropriate here. [Citation.] We think that this solution—calling upon

---

*performance of the job's essential functions*. This assessment will make it possible to ascertain the precise barrier to the employment opportunity which, in turn, will make it possible to determine the accommodation(s) that could alleviate or remove that barrier. [¶] . . . [¶] Once potential accommodations have been identified, the employer *should assess the effectiveness of each potential accommodation in assisting the individual in need of the accommodation in the performance of the essential functions of the position*." (29 C.F.R. pt. 1630, app., § 1630.9 (2008), italics added.) The italicized phrases demonstrate that the interactive process, as articulated by the EEOC in its interpretive guidance, is a means of identifying an accommodation that would allow a particular employee with a disability to perform the *essential functions* of a job that employee holds or desires.

the agency designated by the Legislature to clarify the FEHA—is a better one than importing into the FEHA provisions from the ADA that the Legislature has not seen fit to put there." (97 Cal.App.4th at p. 363.)

We believe the better approach is to provide a reasonable construction of the statute that does not lead to absurd results when considered in the context of the entire statutory scheme. (*Santa Clara Valley Transportation Authority v. Public Utilities Com.* (2004) 124 Cal.App.4th 346, 360 [21 Cal.Rptr.3d 270].) An employer is not liable for discharging an employee with a disability unless the employee was able to perform the essential functions of his or her job with or without accommodation. (§ 12940(a)(1); *Green, supra,* 42 Cal.4th at p. 262.) Under *Bagatti*'s approach, the employer would nevertheless be liable for failing to accommodate the employee even though he or she could not perform the essential functions of the job with the accommodation. Similarly, an employer's duty to engage in an interactive process to identify a reasonable accommodation (as described in the EEOC's interpretive guidance, which has been affirmed by the California Legislature) extends only to accommodations that would enable the employee to perform the essential functions of the position. Under *Bagatti*'s approach, however, an employer could be held liable for failing to accommodate an employee even if it engaged in a good faith interactive process and determined no accommodation was possible that would enable the employee to perform the essential functions of the position the employee held or desired.

We disagree, therefore, with *Bagatti*'s analysis. (See also *Stoll v. The Hartford* (S.D.Cal., Nov. 7, 2006, No. 05CV1907) 2006 U.S.Dist. Lexis 81781, at p. *15, fn. 9 [following *Bagatti*]; *Jacques v. Allstate Ins. Co.* (E.D.Cal., Oct. 18, 2007, No. CV-01994) 2007 U.S.Dist. Lexis 80662, at pp. *4, *8–*9 [same].)[10] We conclude an employer is liable under section 12940(m) for failing to accommodate an employee only if the work environment could have been modified or adjusted in a manner that would have enabled the employee to perform the essential functions of the job.

---

[10] In 2005, the federal district court for the Central District of California criticized *Bagatti* for overlooking the opening language of section 12940, which provides that the following subdivisions were unlawful employment practices " '*unless based upon a bona fide occupational qualification.*' " (*Diaz v. Federal Express Corp.* (C.D.Cal. 2005) 373 F.Supp.2d 1034, 1054, fn. 16, italics added.) "[W]hile subdivision (m) does not make reference to a plaintiff's occupational qualifications, the statute as a whole clearly institutes a requirement that a plaintiff be qualified." (*Ibid.*) We disagree with this analysis because "bona fide occupational qualification" is a term of art with a distinct meaning from "qualified individual with a disability." (See 1 Larson, Employment Discrimination (2d ed. 2007) Disparate Treatment: Other Defenses, § 11.02, pp. 11-3 to 11-15 (rel. 70-6/05).) California regulations define "Bona Fide Occupational Qualification" as a "practice which on its face excludes an entire group of individuals on a basis enumerated in [FEHA]." (Cal. Code Regs., tit. 2, § 7286.7, subd. (a).)

## 2. Burden of Proof

The question now arises whether it is the employees' burden to prove that a reasonable accommodation could have been made, i.e., that they were qualified for a position in light of the potential accommodation, or the employers' burden to prove that no reasonable accommodation was available, i.e., that the employees were not qualified for any position because no reasonable accommodation was available.

■ *Green* addressed the issue of who, in an action brought under section 12940(a), bears the burden of proving an employee is able to perform the essential functions of a job with or without reasonable accommodation. (*Green, supra*, 42 Cal.4th at pp. 257, 262–263.) The court concluded that, because the plain language of section 12940(a) and its paragraph (1) clearly states that an employer is not liable for discharging a person with a disability because of the disability if the person is unable to perform the essential functions of the job with or without reasonable accommodations, the employee bears the burden of proof on the issue: "By its terms, section 12940 makes it clear that drawing distinctions on the basis of physical or mental disability is not forbidden discrimination *in itself.* Rather, drawing these distinctions is prohibited *only if* the adverse employment action occurs because of a disability *and* the disability would not prevent the employee from performing the essential duties of the job, at least not with reasonable accommodation. Therefore, in order to establish that a defendant employer has discriminated on the basis of disability in violation of the FEHA, the plaintiff employee bears the burden of proving he or she was able to do the job, with or without reasonable accommodation." (*Green, supra*, 42 Cal.4th at p. 262.)

The court also observed that the legislative history of section 12940(a) "reflects the Legislature's deliberate effort in 1992 to conform the FEHA to th[e] ADA provision [defining qualified individual with a disability]. . . . It is clear, then, that the Legislature incorporated the ADA requirement with full knowledge of the purpose the language serves in the ADA—as a means of distinguishing permissible employment practices from impermissible disability discrimination based on the employee's ability to perform in the particular employment position with reasonable accommodation." (*Green, supra*, 42 Cal.4th at p. 263, citing 42 U.S.C. § 12111(8).) "Had the Legislature actually intended to relieve a plaintiff employee of the burden of proving an actionable discrimination on the basis of disability, thereby departing significantly from federal law, we believe it could and would have done so in a more conspicuous manner." (*Green, supra*, 42 Cal.4th at p. 264.)

Finally, the court noted that placing the burden of proof on the plaintiff was "consistent with the general rule in California that 'a party has the burden of proof as to each fact the existence or nonexistence of which is essential to the claim for relief . . . that he is asserting.' (Evid. Code, § 500.)" (*Green, supra,* 42 Cal.4th at p. 263.)

Applying *Green*'s burden of proof analysis to section 12940(m), we conclude that the burden of proving ability to perform the essential functions of a job with accommodation should be placed on the plaintiff under this statute as well. First, as just explained, an employee's ability to perform the essential functions of a job is a prerequisite to liability under section 12940(m). Second, the Legislature modeled section 12940(m) on the federal reasonable accommodation requirement (adopting almost verbatim the federal statutory definition of "reasonable accommodation" by way of example). Had the Legislature intended the employer to bear the burden of proving ability to perform the essential functions of the job, contrary to the federal allocation of the burden of proof (see *White v. York Intern. Corp.* (10th Cir. 1995) 45 F.3d 357, 360–363 (*White*); *Willis v. Conopco, Inc.* (11th Cir. 1997) 108 F.3d 282, 284–285 (*Willis*)),[11] it could have expressly provided for that result, but it did not. Finally, general evidentiary principles support allocating the burden of proof on this issue to the plaintiff. (Evid. Code, § 500.)

Other principles governing allocation of the burden of proof also support our conclusion. The "reasonable accommodation" language in section 12940(m) is integral to the statutory language describing the unlawful employment practice. It is not textually subordinate (e.g., set forth in a subdivision) or otherwise phrased as an exception to the general rule, which might indicate the burden of proof should be allocated to the defendant rather than the plaintiff. (See *Green, supra,* 42 Cal.4th at p. 269 (dis. opn. of Werdegar, J.).) Nor do policy considerations support shifting the burden of proof to the defendants. "[E]xceptions to the general rule . . . are made when it is otherwise impossible for the plaintiff to make its case, and when policy considerations support affording the plaintiff greater protection." (*Sargent Fletcher, Inc. v. Able Corp.* (2003) 110 Cal.App.4th 1658, 1673 [3 Cal.Rptr.3d 279].) The plaintiff is in as good a position as the employer to demonstrate he or she could perform the essential functions of a job with accommodations.

---

[11] The federal statute includes an express requirement that the employee be a "qualified individual with a disability," which applies to a failure to accommodate claim as well as a wrongful discharge claim. (42 U.S.C. § 12112(a).) The ADA defines a " 'qualified individual with a disability' " to be "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." (42 U.S.C. § 12111(8).)

Finally, *Raine v. City of Burbank* supports our burden of proof analysis. (*Raine v. City of Burbank* (2006) 135 Cal.App.4th 1215 [37 Cal.Rptr.3d 899] (*Raine*).) The issue in *Raine* was whether an employer was required to convert a temporary light-duty assignment (that lasted six years) into a permanent assignment as an accommodation for an employee's disability. (*Id.* at pp. 1217–1218.) The employee argued that the employer had the burden of proving that converting the assignment into a permanent position would pose an undue hardship, which is an affirmative defense under the FEHA. (135 Cal.App.4th at pp. 1226–1227; § 12940(m) ["Nothing in this subdivision . . . shall be construed to require an accommodation *that is demonstrated by the employer* or other covered entity to produce undue hardship to its operation." (Italics added.)].) The court rejected the argument: "The question presented . . . is not whether assigning Raine to the front desk on a permanent basis imposes an undue hardship, but whether the accommodation requested is reasonable and thus required in the first place." (*Raine*, at p. 1227.) Here too, whether the employee can perform the essential functions of a job with a requested modification is a question of "whether the accommodation requested is reasonable and thus required in the first place." The burden of proving this fact lies with the plaintiff.

In sum, we conclude that in order to prevail on a claim under section 12940(m), the plaintiff bears the burden of proving he or she was able to perform the essential functions of the job with accommodation.

### 3.  *Summary Adjudication Analysis*

As we concluded when addressing the section 12940(a) claim, on this record, there is a triable issue of fact about whether Nadaf-Rahrov was able to perform the essential functions of an available vacant position at Neiman Marcus with or without accommodation. Therefore, there is a triable issue about whether Neiman Marcus failed to reasonably accommodate her by reassigning her to such a position.

### C.  *Section 12940(n)*

Section 12940(n) makes it unlawful "[f]or an employer or other entity covered by this part to fail to engage in a timely, good faith, interactive process with the employee or applicant to determine effective reasonable accommodations, if any, in response to a request for reasonable accommodation by an employee or applicant with a known physical or mental disability or known medical condition." The following questions arise: (a) must a reasonable accommodation have been available before an employer can be held liable for failing to engage in the good faith interactive process or does

the simple failure to engage in a good faith interactive process alone give rise to liability, and (b) if a reasonable accommodation must have been available, who bears the burden of proof on that question?

### 1. Availability of Reasonable Accommodation

■ Federal courts applying the ADA have held that an employer may be held liable for failing to engage in the good faith interactive process only if a reasonable accommodation was available, and that the employee bears the burden of proof on this issue. (*White, supra*, 45 F.3d at p. 363 (10th Cir.); *Willis, supra*, 108 F.3d at pp. 284–287 (11th Cir.); *McCreary v. Libbey-Owens-Ford Co.* (7th Cir. 1997) 132 F.3d 1159, 1165 (*McCreary*); *Aka, supra*, 156 F.3d at p. 1304, fn. 27 (D.C. Cir.) [in bank]; *Midland Brake, supra*, 180 F.3d at p. 1179 (10th Cir.) [in bank]; *Jackan v. New York State Dept. of Labor* (2d Cir. 2000) 205 F.3d 562, 567–568 & fn. 4 (*Jackan*); see also *Phoenixville, supra*, 184 F.3d at pp. 317–318 (3d Cir.) [not addressing burden of proof]; *Fjellestad, supra*, 188 F.3d at p. 952 (8th Cir.) [same]; *Barnett v. U.S. Air, Inc.* (9th Cir. 2000) 228 F.3d 1105, 1113, 1116 [same] (*Barnett*), vacated on other grounds *sub nom. US Airways, Inc. v. Barnett* (2002) 535 U.S. 391 [152 L.Ed.2d 589, 122 S.Ct. 1516].)

The rationale for the federal rule is that imposing liability for failure to engage in the interactive process where no reasonable accommodation was possible would be inconsistent with the remedial goals of the ADA: "We also do not believe an approach as punitive in nature as Plaintiff's view of an 'interactive process' requirement comports with the basic goal of the ADA, which we understand to be remedial in nature—ensuring that those with disabilities can fully participate in all aspects of society, including the workplace. *See e.g.* 42 U.S.C. § 12101(a)(8) ('[T]he Nation's proper goals regarding individuals with disabilities are to assure equality of opportunity, full participation, independent living, and economic self-sufficiency for such individuals . . . .') The ADA, as far as we are aware, is not intended to punish employers for behaving callously if, in fact, no accommodation for the employee's disability could reasonably have been made." (*Willis, supra*, 108 F.3d at p. 285.) *Willis* further explains that, although it would be unfair to require an employee in the workplace to unilaterally identify available accommodations, a plaintiff in *litigation* can use discovery procedures to do so: "Whatever may be said of [the plaintiff's] 'burden' as an employee in the day-to-day workplace seeking an accommodation for her condition, Plaintiff—as a litigant bringing an ADA action—has failed to produce evidence

(after the *completion* of discovery) of the existence of any 'accommodation' at all, 'reasonable' or otherwise." (*Willis, supra,* 108 F.3d at p. 287; see also *Jackan, supra,* 205 F.3d at p. 568, fn. 4.)

We conclude the California Legislature intended section 12940(n) to be construed in the same manner. First, as noted previously, when the California Legislature enacted section 12940(n) it also enacted section 12926.1, subdivision (e), which expressly affirms the importance of the interactive process "as this requirement has been articulated by the Equal Employment Opportunity Commission." We read section 12926.1, subdivision (e) as a strong indicator that the Legislature intended section 12940(n) to be construed consistently with the interactive process requirement under the ADA. (See *Raine, supra,* 135 Cal.App.4th at p. 1226, fn. 7 [where provisions are similarly worded, federal decisions interpreting ADA are instructive in applying FEHA]; *Green, supra,* 42 Cal.4th at pp. 262–263 [where Legislature deliberately attempted to conform the FEHA to the ADA, the two acts should be construed similarly].)

Second, the policy rationale set forth in *Willis, supra,* 108 F.3d at page 285, applies under the FEHA as well because the statute has a remedial purpose similar to that of the ADA: "It is hereby declared as the public policy of this state that it is necessary to protect and safeguard the right and opportunity of all persons to seek, obtain, and hold employment without discrimination or abridgment on account of . . . physical disability, mental disability, medical condition, . . . [¶] . . . [¶] . . . [and] to provide effective remedies that will eliminate . . . discriminatory practices." (§ 12920.)

Third, section 12940(n) requires employers to engage in the interactive process "to determine effective reasonable accommodations, *if any*." (§ 12940(n), italics added.) This phrase could reasonably be construed to mean that an employer's failure to engage in the interactive process is an unlawful employment practice (i.e., gives rise to liability) only if a reasonable accommodation existed.

Finally, if the statute is construed to impose liability even if no reasonable accommodation was possible, it provides no guidance as to what would be an appropriate remedy in such circumstances.

In light of the remedial goals of the FEHA, which coincide with the remedial goals of the ADA, and the Legislature's express indication that

the interactive process should be understood as it has been articulated by the EEOC, we conclude that section 12940(n) imposes liability only if a reasonable accommodation was possible.

### 2. *California Case Law*

In a line of cases beginning with *Prilliman v. United Air Lines, Inc.*, California Courts of Appeal adopted the equivalent of an interactive process requirement even before the enactment of section 12940(n). (*Prilliman v. United Air Lines, Inc.* (1997) 53 Cal.App.4th 935, 950–951 [62 Cal.Rptr.2d 142]; *Hanson v. Lucky Stores, Inc., supra,* 74 Cal.App.4th at p. 225; *Spitzer, supra,* 80 Cal.App.4th at pp. 1384–1385.) These cases involved requests for reassignment and the courts held that the employer was not liable if there was no vacant position for which the employee was qualified. (*Prilliman,* at p. 952; *Spitzer,* at p. 1389.) The Legislature nevertheless enacted section 12940(n) without specifically providing that an employer would be liable for failing to engage in the interactive process even if no reasonable accommodation was available. This body of case law, therefore, tends to support our construction of the statute.

Two published decisions include language suggesting or holding that ability to perform the essential functions of a job is not an element of a section 12940(n) claim. We find the cases either distinguishable or unpersuasive.

In *Claudio v. Regents of University of California,* the Third District reviewed a grant of summary judgment for the employer on a section 12940(n) claim. (*Claudio v. Regents of University of California* (2005) 134 Cal.App.4th 224, 243 [35 Cal.Rptr.3d 837] (*Claudio*).) The court held, "[S]ince we conclude a triable issue exists concerning failure by the University to participate in the interactive process, the judgment cannot be affirmed on the ground that no alternative jobs were available." (*Id.* at p. 248; see also *id.* at p. 245 ["Because we shall conclude a triable issue exists as to whether the University failed to participate in the interactive process, it cannot be known whether an alternate job would have been found."].) However, in the summary judgment proceeding under review, the employer had not demonstrated that no accommodation was available. The employer only produced "evidence that no alternate positions were available at the University campus for the *apparent* job skills reflected in plaintiff's *original* job application and resume." (*Id.* at p. 248, italics added.) The court observed, "At a minimum, it appears plaintiff may have been physically able to handle clerical positions.

Thus, this is not a case (at least not *yet*) where it can be said an interactive process would have been futile. (Cf. *Swonke v. Sprint, Inc.* (2004) 327 F.Supp.2d 1128, 1137 [interactive process would have been futile because plaintiff was totally disabled from any employment].)" (*Id.* at p. 249, italics added.) The phrase "at least not yet" suggests that it might become apparent later in the litigation (i.e., on remand) that the interactive process *was* futile because no reasonable accommodation would have been available and that the employer then would not be held liable for failing to engage in a futile interactive process. We do not read *Claudio* to be inconsistent with our interpretation of section 12940(n).

In *Wysinger v. Automobile Club of Southern California*, the Second District similarly wrote that the FEHA, unlike the ADA, imposes liability on employers for failing to engage in the interactive process regardless of whether a reasonable accommodation was possible: "No provision in the ADA imposes liability on employers who refuse to engage in the interactive process. [Citation.] An employee who proves such bad faith employer conduct has no remedy unless he or she also shows that his or her disability could have been reasonably accommodated. [Citation.] [¶] *By contrast*, FEHA allows an independent cause of action for employees whose employers fail to engage in the interactive process. This provision does not require proof of the elements required by the ADA. (Gov. Code, § 12940, subd. (n); *Claudio, supra*, 134 Cal.App.4th at p. 243.)"[12] (*Wysinger v. Automobile Club of Southern California* (2007) 157 Cal.App.4th 413, 425 [69 Cal.Rptr.3d 1] (*Wysinger*), italics added.) We disagree.

In *Wysinger*, the jury had found for the employer on a claim for failure to accommodate, but against the employer on a claim for failure to engage in the interactive process. (*Wysinger, supra*, 157 Cal.App.4th at p. 424.) The employer in *Wysinger* argued that the jury's verdicts were inconsistent because in order to prevail on a section 12940(n) claim the employee also had to prove a violation of section 12940(m). (*Wysinger, supra*, 157 Cal.App.4th at p. 425.) Rejecting this argument, the court held there was no requirement under section 12940(n) that an employee show a reasonable accommodation was possible.[13] (157 Cal.App.4th at p. 425.) If that showing

---

[12] At page 243, *Claudio* explains that FEHA, unlike the ADA, establishes separate causes of action for disability discrimination, failure to accommodate, and failure to engage in the good faith interactive process. (*Claudio, supra*, 134 Cal.App.4th at p. 243.)

[13] *Wysinger* does not explain what would be an appropriate remedy for a section 12940(n) violation in the absence of a failure to accommodate. The court did not need to confront this issue because the jury had also found the employer liable for retaliation against the employee because he filed a complaint of age discrimination. (*Wysinger, supra*, 157 Cal.App.4th at p. 419.) The jury awarded $204,000 in economic damages to the employee, who suffered depression as a result of the employer's conduct and became unable to work. (*Ibid.*)

were required, the court reasoned, section 12940(n) would be superfluous. (157 Cal.App.4th at p. 425.) Moreover, it would allow employers to limit their liability by bad faith conduct: "Employers who violate subdivision (n) by withholding information that could lead to a reasonable accommodation could avoid liability for violation of section 12940, subdivision (m). (*Jensen, supra*, 85 Cal.App.4th at p. 262.) ' "Employees do not have at their disposal the extensive information concerning possible alternative positions or possible accommodations which employers have. . . ." ' (*Ibid.*)" (*Ibid.*)

In this passage, *Wysinger* assumes that in the absence of a finding of liability under section 12940(m), a plaintiff who prevails under section 12940(n) cannot recover for damages caused by an employer's failure to provide a reasonable accommodation that results from an employer's failure to engage in the good faith interactive process. We disagree with this assumption. If a failure to provide a reasonable accommodation is a consequence of a section 12940(n) violation, we see no reason why a plaintiff could not recover damages for that failure to accommodate, even if the plaintiff prevailed only on a section 12940(n) claim. Such a construction does not, as *Wysinger* states, render section 12940(n) superfluous. Section 12940(m) applies even without a showing that the employer failed to engage in the interactive process. Where a necessary accommodation is obvious, where the employee requests a specific and available reasonable accommodation that the employer fails to provide, or where an employer participates in a good faith interactive process and identifies a reasonable accommodation but fails to provide it, a plaintiff may sue under section 12940(m). Section 12940(n), which requires proof of failure to engage in the interactive process, is the appropriate cause of action where the employee is unable to identify a specific, available reasonable accommodation while in the workplace and the employer fails to engage in a good faith interactive process to help identify one, but the employee is able to identify a specific, available reasonable accommodation through the litigation process. In short, the two causes of action address different factual circumstances.

We disagree, therefore, with *Wysinger*'s construction of section 12940(n). We conclude that the availability of a reasonable accommodation (i.e., a modification or adjustment to the workplace that enables an employee to perform the essential functions of the position held or desired) is necessary to a section 12940(n) claim.

### 3. Burden of Proof

Applying the burden of proof analysis in *Green, supra*, 42 Cal.4th 254, we conclude the burden of proving the availability of a reasonable accommodation rests on the employee. First, for the reasons just explained, the availability of a reasonable accommodation is a prerequisite to liability under section 12940(n). Second, when the Legislature enacted section 12940(n), it deliberately associated the interactive process requirement with the parallel federal requirement as it had been articulated by the EEOC. (§ 12926.1, subd. (e).) That is, the Legislature understood the importance of the "reasonable accommodation" language in section 12940(n) as a limitation on the employer's liability for failing to engage in a good faith interactive process to identify an accommodation. (See *Green*, at pp. 262–263.) Had the Legislature intended to shift that burden to the employer, it could have said so, but it did not. Third, the general evidentiary rule governing allocation of the burden of proof supports allocation to the employee. (Evid. Code, § 500.) The "reasonable accommodation" language in section 12940(n) is integral to the language of the provision; it is not textually subordinate or otherwise phrased as an exception to the general rule, which might indicate the burden of proof should be allocated to the employer rather than the employee. (See *Green, supra*, 42 Cal.4th at p. 269 (dis. opn. of Werdegar, J.).)

Nor do policy considerations support shifting the burden of proof to the employer. (See *Sargent Fletcher, Inc. v. Able Corp., supra*, 110 Cal.App.4th at p. 1673.) Although it would be unfair to require an employee in the workplace to unilaterally identify available accommodations, an employee in litigation can use discovery procedures to do so. (See *Willis, supra*, 108 F.3d at p. 287.)

We conclude the employee who brings a section 12940(n) claim bears the burden of proving a reasonable accommodation was available before the employer can be held liable under the statute.

### 4. Summary Adjudication Analysis

" '[T]he interactive process requires communication and good-faith exploration of possible accommodations between employers and individual employees' with the goal of 'identify[ing] an accommodation that allows the employee to perform the job effectively.' ([*Barnett, supra*, 228 F.3d at p. 1114.]) . . . [F]or the process to work '[b]oth sides must communicate

directly, exchange essential information and neither side can delay or obstruct the process.' (*Id.* at pp. 1114–1115, fn. omitted.) When a claim is brought for failure to reasonably accommodate the claimant's disability, the trial court's ultimate obligation is to ' "isolate the cause of the breakdown . . . and then assign responsibility" so that "[l]iability for failure to provide reasonable accommodations ensues only where the employer bears responsibility for the breakdown." [Citation.]' (*Id.* at p. 1115, quoting *Beck v. University of [Wisconsin] Bd. of Regents* (7th Cir. 1996) 75 F.3d 1130, 1135–1137.)" (*Jensen, supra,* 85 Cal.App.4th at p. 261.) Nadaf-Rahrov has raised a triable issue of fact about whether Neiman Marcus bears responsibility for breakdowns in the interactive process.

The evidence shows that Neiman Marcus's initial response to Nadaf-Rahrov's request for reassignment was appropriate. Upon receiving the January 2004 letters asking that Nadaf-Rahrov be reassigned to a new position, Butler spoke to Nadaf-Rahrov about her professional qualifications, her medical restrictions, and the available positions at Neiman Marcus. Nadaf-Rahrov said she was unable to work at all at that time. Butler told Nadaf-Rahrov that once her medical restrictions were modified to the point she could perform some work, she should contact Butler, who would then explore alternate positions for her. Nadaf-Rahrov verbally agreed to do so. Butler and Nadaf-Rahrov confirmed this understanding in writing in late February.

Therefore, at least as of February 2004, Neiman Marcus engaged in a good faith interactive process to identify a reasonable accommodation for Nadaf-Rahrov. Nadaf-Rahrov does not contend otherwise. However, the fact that an employer took some steps to work with an employee to identify reasonable accommodations does not absolve the employer of liability under section 12940(n). If the employer is responsible for a later breakdown in the process, it may be held liable. (See *Spitzer, supra,* 80 Cal.App.4th at pp. 1388, 1390 [where triable issue exists whether employer knew initial accommodation was ineffective, employer may be liable for failing to provide further accommodation]; *Fjellestad, supra,* 188 F.3d at pp. 952–953 & fn. 6 [factual dispute about whether employer engaged in good faith interactive process even though employer provided some accommodations].)

After February 2004, Nadaf-Rahrov spoke to someone in the human resources department about once a month to report on the status of her

medical leave. Butler avers: "At no time after Ms. Nadaf-Rahrov's February 24, 2004 letter did she ever inform me or, to my knowledge, anyone else at [Neiman Marcus], that she had been released to return to work in any capacity." Butler testified that Nadaf-Rahrov personally "confirmed to me over the phone that she was unable to come back to work." Nadaf-Rahrov acknowledged that she never told Neiman Marcus at any time before her termination that she was ready to return to work or that she was released to return to work. However, she characterizes her conversations with human resources as frustrating her attempts to provide such a release: "I keep asking if they can give me another job, and they said, no, you have to be released from your doctor until we talk about another job, and I don't know when my doctor is going to release me, because I do not want to lose my job." "I asked Kelly [Butler] if I can get some—another department job, and she said, when you—your doctor has to release you—to come and then we talk about it. She doesn't want to talk about it and give me any job until I get released from my doctor. [¶] . . . [¶] Kelly asked me, ask your doctor what kind of job you can do. [¶] And I told Kelly, my doctor doesn't know what kind of job we have in Neiman Marcus. You are a manager. You tell me what kind of job you have, then I can tell you I can do the job or not. But she said after you are released from the doctor. [¶] . . . [¶] . . . [A]nd one time the doctor wrote a letter to Neiman Marcus and released me for—said she can come back to job but not the same job, but they wanted date . . . . [¶] I said, okay. I will call him and ask him a date. So I went back to him, and I said, they want—they want to know what—which day I can go back to work. [¶] Then he wrote another letter."[14] Butler does not dispute that these conversations took place.

A reasonable jury could find, drawing all inferences from the evidence in favor of Nadaf-Rahrov, that Neiman Marcus caused a breakdown in the interactive process by refusing to provide information about available positions that might have assisted Nadaf-Rahrov in preparing a list of her work-related medical restrictions. Moreover, a jury could find that Neiman Marcus's demand for a medical release before it would reengage in the interactive process was unreasonable. A medical doctor might not want to release a severely disabled patient for unspecified work without knowing the exact demands of the job the patient would be expected to do.

Although *Jensen* holds, "It is an employee's responsibility to understand his or her own physical or mental condition well enough to present the

---

[14] Nadaf-Rahrov did not identify this final letter during her deposition testimony. The only letter in the record that is similar to her description is Dr. Klompus's June 28, 2004 medical note.

employer at the earliest opportunity with a concise list of restrictions which must be met to accommodate the employee" (*Jensen, supra*, 85 Cal.App.4th at p. 266), this responsibility is carried out in the context of the interactive process. In the next sentence, *Jensen* observes that "it is the responsibility of both sides to keep communications open and neither side has a right to obstruct the process." (*Ibid.*) The EEOC interpretive guidance describes a back-and-forth process of *sharing* information about available jobs (on the employer's part) and physical limitations (on the employee's part). (29 C.F.R. pt. 1630, app., § 1630.9 (2008).) In fact, the four-step process set forth in the interpretive guidance *begins* with a description of the essential functions of the particular job involved. (*Ibid.*) In the context of a request for reassignment to a vacant position, the particular job involved would be an available vacant position. (See *Aka, supra*, 156 F.3d at p. 1301.)

In *Jensen*, the employer alleged that the interactive process broke down because the employee had provided such a *long* list of restrictions that she could not reasonably be accommodated and because the employee refused to talk to the employer's representatives. (*Jensen, supra*, 85 Cal.App.4th at p. 266.) Here, Neiman Marcus takes the position that the interactive process could not move forward until Nadaf-Rahrov provided more specific work restrictions, but there is evidence that Neiman Marcus's own intransigence interfered with Nadaf-Rahrov's ability to do so. In *Midland Brake*, the Tenth Circuit addressed a similar set of circumstances: "The district court . . . held that the ADA's interactive process does not require an employer affirmatively to seek out a release for an employee who has previously been taken off work by his or her physician. . . . There are no doubt cases in which the employee's failure to provide a medical release is unreasonable, breaks down the interactive process, and thereby insulates the employer from ADA liability. [Citation.] On the other hand, there may be some cases in which it is reasonable for the employer affirmatively to seek out a medical release . . . or at least to clarify for the employee exactly what is required before the employee can be reassigned to a new position. Indeed, in Smith's case, there appears to be genuine disputes about this very type of interactive exchange. . . . Smith argues he was never made aware of any vacant positions in Midland Brake, and had he been aware of such vacancies, his physicians might have released him to work in those new jobs." (*Midland Brake, supra*, 180 F.3d at pp. 1173–1174.) We conclude there is a triable issue of fact about whether Nadaf-Rahrov or Neiman Marcus was responsible for the breakdown in the interactive process.

Butler defends her decision to terminate Nadaf-Rahrov as follows: "At the time, [Nadaf-Rahrov] did not have a release from her doctor to perform work

of any kind. Even with a release, I concluded that given her existing (and continuing) restrictions, she was not qualified to fill any open and available position within [Neiman Marcus]. Moreover, Ms. Nadaf-Rahrov utterly failed to provide me with any reason to believe that her condition was likely to change anytime in the near future. In fact, our conversations and correspondence (or the lack thereof) lead [*sic*] me to believe just the opposite." Butler also noted that Nadaf-Rahrov had exhausted her vacation and sick leave benefits. She added during her deposition testimony, "That's not to say that . . . that the door would have been closed. [¶] We had to terminate her employment based on the information that we had, but had she communicated to me in the future that she was then able to come to work, then we still could have considered our options."

A reasonable jury could find these rationales inadequate to preclude liability under the FEHA. Nadaf-Rahrov had just provided a note stating that she might be able to return to work in a new position in August 2004. In light of Neiman Marcus's apparent refusal to provide information about open positions that might have allowed Nadaf-Rahrov to provide a more specific medical release, a reasonable jury could find that the tentativeness of the note did not alone justify her termination. Neiman Marcus also places great weight on the fact that back in November 2003, Dr. Klompus checked a box on a form indicating that Nadaf-Rahrov could not perform work of any kind, and that he never affirmatively released Nadaf-Rahrov to perform work of any kind thereafter. In light of Nadaf-Rahrov's and Dr. Klompus's representations in the meantime that she wanted to be reassigned to another position at Neiman Marcus, and Nadaf-Rahrov's requests for work-related information so she could obtain a specific medical release from her doctor, a jury could find that Neiman Marcus's reliance on the earlier passive representation on the FMLA form was unreasonable and caused a breakdown in the interactive process.

A jury could also find it was unreasonable for Neiman Marcus to determine unilaterally that Nadaf-Rahrov was unable to perform any available vacant position in the company with or without accommodation and that her condition was not going to improve in the near future. Although an employer need not provide repeated leaves of absence for an employee who has a poor prognosis of recovery (*Hanson v. Lucky Stores, Inc., supra,* 74 Cal.App.4th at p. 226), the mere fact that a medical leave has been repeatedly extended does not necessarily establish that it would continue indefinitely. In some circumstances, an employer may need to consult directly with the employee's physician to determine the employee's medical restrictions and prognosis for

improvement or recovery. (See *id.* at p. 229 [employer reviewed physician's report and consulted with physician]; *Midland Brake, supra,* 180 F.3d at pp. 1173–1174; *Beck v. University of Wisconsin Bd. of Regents, supra,* 75 F.3d at p. 1137 ["The fact that the missing information concerns the employee's medical condition might not always indicate that the employee is responsible for failing to specify a necessary accommodation . . . ."].)

Finally, a jury could find that Neiman Marcus's decision to terminate Nadaf-Rahrov without advance warning or further discussion was unreasonable and caused a breakdown in the interactive process, i.e., because it was unreasonable for Neiman Marcus to determine unilaterally that Nadaf-Rahrov could not perform any available vacant position and would not be able to do so in the foreseeable future, Neiman Marcus needed to engage in further discussion with Nadaf-Rahrov before concluding that no reasonable accommodation was possible. Butler avers that Nadaf-Rahrov could always have approached her following the termination with a medical release allowing her to perform an alternate position, but it would be unreasonable to expect an employee who had been summarily dismissed to intuit such an open-door policy.

## II. *Retaliation*

■ In March 2008, the Supreme Court held that nonemployer individuals are not personally liable for retaliation. (*Jones v. The Lodge at Torrey Pines Partnership* (2008) 42 Cal.4th 1158, 1160 [72 Cal.Rptr.3d 624, 177 P.3d 232].) Therefore, we affirm the grant of summary judgment in favor of Butler on the retaliation claim, the only claim brought against her. The retaliation claim against Neiman Marcus, however, is unaffected by *Jones.*

■ Nadaf-Rahrov relies on indirect evidence of retaliatory intent to establish her retaliation claim against Neiman Marcus. Therefore, her initial burden is to show that (1) she engaged in a protected activity, (2) Neiman Marcus subjected her to an adverse employment action, and (3) there was a causal link between the two. (*Yanowitz v. L'Oreal USA, Inc.* (2005) 36 Cal.4th 1028, 1042 [32 Cal.Rptr.3d 436, 116 P.3d 1123] [applying § 12940, subd. (h)].) If she establishes that prima facie case, Neiman Marcus must offer a legitimate, nonretaliatory reason for the adverse employment action. (*Ibid.*) If Neiman Marcus makes that showing, the burden shifts back to Nadaf-Rahrov to prove intentional retaliation. (*Ibid.*)

Nadaf-Rahrov produced evidence that she asked for an accommodation for her disability in January 2004, which was protected activity, and that she was fired in July 2004. She relies on a temporal nexus to establish a causal link between her request for an accommodation and her termination. (See *Loggins v. Kaiser Permanente Internat.* (2007) 151 Cal.App.4th 1102, 1112 [60 Cal.Rptr.3d 45] (*Loggins*).) We assume for purposes of argument that she established her prima facie case.

Neiman Marcus provided the following legitimate nondiscriminatory reason for Nadaf-Rahrov's termination: she had informed the company that she was not physically able to perform work of any kind; she had given Neiman Marcus no reason to believe her condition would change in the near future; and she had exhausted her sick and vacation leave. Nadaf-Rahrov has not produced evidence that would support an inference that this legitimate reason was a pretext and that she was actually fired for a retaliatory motive. Temporal proximity does not alone satisfy this burden. (*Loggins, supra,* 151 Cal.App.4th at pp. 1112–1113.) Moreover, the fact that this rationale might not have absolved Neiman Marcus of liability under Nadaf-Rahrov's disability-related claims does not demonstrate that Neiman Marcus's true motive was retaliation.

Nadaf-Rahrov cites evidence of what she describes as hostility toward her, but this evidence does not support an inference of retaliatory intent. She cites evidence that Butler and Humphrey did not provide her with a workers' compensation form, did not inform her of her rights, refused to discuss vacant positions with her until she provided a medical release, and refused to consult with her doctor. These facts might establish violations of section 12940(n) or of workers' compensation laws, but they do not demonstrate animus toward Nadaf-Rahrov, much less animus based on her having requested an accommodation for her disability. They do not approach the evidence found to have raised a triable issue of retaliatory intent in other cases. (See *Flait v. North American Watch Corp.* (1992) 3 Cal.App.4th 467, 479–480 [4 Cal.Rptr.2d 522] [employer's poor performance justification for termination not supported by evidence and undermined by evidence of employee's good performance and by timing of the termination]; *Sada v. Robert F. Kennedy Medical Center* (1997) 56 Cal.App.4th 138, 156–157 [65 Cal.Rptr.2d 112] (*Sada*) [poor performance justification for termination undermined by evidence of good performance reviews, hostility of person who performed final review, close temporal proximity to protected activity, and hostile remarks by supervisor];

*Iwekaogwu v. City of Los Angeles* (1999) 75 Cal.App.4th 803, 816–817 [89 Cal.Rptr.2d 505] [poor performance justification for termination undermined by evidence of hostile remarks and disparate treatment of similarly situated employees].)

We conclude summary adjudication was properly granted to Neiman Marcus on the retaliation cause of action.

### III. *National Origin and Ethnicity Discrimination*

Nadaf-Rahrov alleges she was a victim of national origin and ethnicity (Iranian or Middle Eastern) discrimination. She argues that she was denied reasonable accommodation while non-Middle Eastern employees were provided reasonable accommodation, and that her termination was part of a pattern of discriminatory discharges of Middle Eastern employees following the attack of September 11, 2001.

Nadaf-Rahrov relies on indirect evidence of discriminatory intent. Therefore, her initial burden is to show that (1) she is a member of a protected class; (2) she suffered an adverse employment action; and (3) similarly situated persons who were not members of the protected class did not suffer the same adverse employment action. Neiman Marcus would then have to provide a legitimate nondiscriminatory reason why Nadaf-Rahrov was treated differently. Once Neiman Marcus provided that reason, Nadaf-Rahrov would have to show the nondiscriminatory reason put forth by Neiman Marcus was mere pretext and that the true reason for the adverse employment action was discriminatory intent. (See *Sada, supra,* 56 Cal.App.4th at pp. 148–150.) Because proof of discriminatory intent often depends on inferences rather than on direct evidence, very little evidence of such intent is necessary to defeat summary judgment. (*Spitzer, supra,* 80 Cal.App.4th at p. 1386; *Heard v. Lockheed Missiles & Space Co.* (1996) 44 Cal.App.4th 1735, 1751 [52 Cal.Rptr.2d 620].)

It is undisputed that Nadaf-Rahrov is Middle Eastern (Iranian) and that her termination was an adverse employment action. As evidence of disparate treatment, she cites her own deposition testimony that two other Neiman Marcus employees with disabilities were accommodated by reassignment to other positions. She identified one by gender, prior position, disability, and new position (i.e., sufficiently to permit Neiman Marcus to identify the

employee by name), and the other by name (Kayko Humphrey). She does not identify either employee by national origin or ethnicity in her deposition testimony, but she states in her opening brief on appeal that they were both non-Middle Eastern employees. Neiman Marcus does not dispute the characterization. We conclude Nadaf-Rahrov made her prima facie case.

Although Neiman Marcus provides a nondiscriminatory reason for Nadaf-Rahrov's termination, it does not directly address the alleged *disparate treatment* of Nadaf-Rahrov and the non-Middle Eastern employees who allegedly were accommodated. Neiman Marcus notes that Nadaf-Rahrov has no direct evidence of discriminatory intent motivating her termination or of ethnic hostility toward her by the individual defendants. As stated, however, Nadaf-Rahrov may base her claim on indirect evidence of discriminatory intent. Neiman Marcus notes that Nadaf-Rahrov produced no evidence that she was replaced in her clothes fitter job with a non-Middle Eastern employee. However, Nadaf-Rahrov does not claim she was discriminatorily removed from and replaced in the clothes fitter position; she admits she could no longer perform the essential functions of that job with or without accommodation. Her claim is based on disparate treatment, based on national origin and ethnicity, of disabled employees who need accommodations.

Assuming for purposes of argument that Neiman Marcus has satisfied its burden to produce evidence of a legitimate nondiscriminatory reason for Nadaf-Rahrov's termination, Nadaf-Rahrov successfully rebutted that showing with evidence of Neiman Marcus's discriminatory treatment of other Middle Eastern employees at Neiman Marcus. She submitted two sworn declarations by employees describing such treatment. The trial court ruled that "Plaintiff's attempt to establish a 'pattern and practice' of discrimination through anecdotal evidence of incidents of disparate treatment allegedly experience[d] by two former [Neiman Marcus] employees is unavailing because Plaintiff admits she has no personal knowledge of any of the assertions made in either declaration." This ruling was erroneous. The evidence Nadaf-Rahrov cites is not "anecdotal evidence," but sworn affidavits setting forth facts within the personal knowledge of the affiants. They are competent evidence of discriminatory practices at Neiman Marcus, which is relevant to Nadaf-Rahrov's claim that she was subjected to discriminatory treatment as well. Admittedly, the link between these employees' experiences and Nadaf-Rahrov's termination is tenuous, but very little evidence of discriminatory intent is necessary to defeat summary judgment. The motion should have been denied as to this cause of action.

## DISPOSITION

The judgment is reversed except as to Butler. Summary adjudication of the retaliation and age discrimination claims is affirmed; the appeal is dismissed as to summary adjudication of the Labor Code section 132a and related wrongful termination claims; and summary adjudication of all other claims is reversed. The discovery order is vacated and remanded for reconsideration. Nadaf-Rahrov shall receive her costs on appeal.

Jones, P. J., and Simons, J., concurred.