Filed 4/18/25  Albano v. City of Los Angeles CA2/3

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| VINCENT ALBANO, | B329165 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. 20STCV35354) |
| v. | |
| CITY OF LOS ANGELES, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Maurice A. Leiter, Judge.  Affirmed.

Hydee Feldstein Soto, City Attorney, Denise C. Mills, Chief Deputy City Attorney, Scott Marcus and Kathleen A. Kenealy, Chief Assistant City Attorneys, Shaun Dabby Jacobs and Rebekah Young, Deputy City Attorneys, for Defendant and Appellant.

McNicholas & McNicholas, Matthew S. McNicholas, Douglas D. Winter; Esner, Chang, Boyer & Murphy, Stuart B. Esner and Kiran R. Iyer for Plaintiff and Respondent.

—————————————

Plaintiff and respondent Vincent Albano sued defendant and appellant City of Los Angeles (the City), alleging violations of the Fair Employment and Housing Act, Government Code section 12900 et seq. (FEHA).[1]  Albano, an officer with the Los Angeles Police Department (LAPD or the department), claimed the department failed to accommodate his disability and failed to engage in the interactive process.  A jury returned a verdict rejecting the reasonable accommodation claim but finding the City failed to engage in the interactive process.  It awarded Albano past and future noneconomic damages totaling $1 million.  The trial court entered judgment and denied the City's subsequent motion for a new trial.  On appeal, the city contends substantial evidence does not support the jury's verdict or its damages award.  We affirm the judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

In 1997, Albano joined the LAPD as a transit officer.  He began working in patrol at the LAPD's Harbor Division in 1999.  In 2003, Albano began experiencing periods of extreme fatigue that would last one or two weeks.  He also developed severe insomnia and was able to sleep only two to three hours each night.  Albano's symptoms progressively worsened.  He experienced extreme body aches and debilitating fatigue.

---

[1]     All further statutory references are to the Government Code.

In February 2004, Albano took a medical leave of absence. He was bedridden for approximately five months. He "went from a fully active 42-year-old man to almost an invalid." He could not attend family events or make weekend plans, perform basic tasks like mowing his lawn, or continue his workouts, and he took time off to try different medical treatments with adverse side effects. He also testified that he could not "travel out of this time zone . . . because of the sleep interruption." Eventually, Albano saw a doctor specializing in chronic fatigue syndrome who determined Albano's symptoms were caused by an "enteroviral infection, more specifically Coxsackie B4 virus."

Albano returned to work in July 2004 with medical restrictions limiting him to "desk duties/low stress." He explained his health issues and requested an accommodation from his lieutenant. His lieutenant assigned him to the detectives' desk. At the detectives' desk, Albano assisted members of the public, released impounded vehicles, registered sex offenders and gang members, trained student workers, and completed police reports. Albano worked "day watch," from 7:00 a.m. to 5:00 p.m., Monday through Thursday. He consistently received positive performance reviews in this position. He continued working at the detectives' desk from 2004 to 2018.

Around 2007, the department required him to regularly provide a doctor's note to extend his accommodation. He annually provided the LAPD's Sick and Injured-On-Duty Coordinator notes from his doctor confirming that he should remain on light-duty status. Albano's medical restrictions consistently required that he work only day shifts.

In 2008, a new LAPD captain required Albano to submit to an examination by a City doctor. Albano testified the new

captain "didn't like [light-duty employees] and he didn't want them there" and wanted to "determine whether or not [Albano was] actually sick or not."  The examining doctor confirmed Albano was sick and noticed his blood pressure was very high.  Albano told her, "[T]he reason my blood pressure is so high is because I'm a man of integrity, and I feel like I'm being questioned, I feel like I'm being treated like I'm a faker."  In a medical note, the doctor permitted Albano to return to work with the same restrictions imposed previously.  She also specified: " 'Office work only.  No field work, no nightshifts.' "  She commented that Albano's restrictions were " 'indefinite.' "

At some point, Lieutenant Susan Willis, who oversaw the detectives at Harbor Division, asked Albano if he was interested in taking over the position of Property Disposition Coordinator.  The Property Disposition Coordinator generated reports regarding property held by the LAPD that must be sent to an investigator, released to a party, or destroyed.  The position could be filled by a civilian police services representative (dispatchers) or by a sworn officer.  The Property Disposition Coordinator at the time was set to retire in 2018 or 2019, and Willis wanted Albano to replace her.  She offered the position to Albano because the schedule was flexible.  Albano was "all in," particularly because it would better accommodate his hypertension since it would reduce his contact with the public.  He planned with the current coordinator to start training full-time at the beginning of 2019.  In late November 2018, Willis sent an e-mail requesting that Albano be given access to several information systems necessary for the Property Disposition Coordinator position.  Willis's e-mail stated that Albano " 'will begin training on the

4

above-named department systems in anticipation of the Area Property Disposition Coordinator's Retirement.' "

From July to November 2018, Albano took time off due to hypertension.[2] On November 20, 2018, after returning to work, Albano received an e-mail from Teresa Chin. Chin worked in the return-to-work section and was responsible for determining whether police officers could perform the essential functions of their job. She was aware the LAPD "is very active in trying to decrease sick and [injured-on-duty] numbers."

In the e-mail, Chin asked Albano if his restrictions ("Light duty," "Restricted to desk duty," "Day watch," "No field work") were permanent or if he would "be able to become full duty again[.]" Albano replied, "I've had Chronic Fatigue Syndrome since 2004 which [is] a viral infection. I've tried numerous drugs and supplements to overcome this illness with no success. My gut feeling is this is a life sentence for me and I will never be well again. I'm being treated by the best physician for this illness and will continue trying anything he comes up with to get me well." Chin asked to meet with Albano on December 6 "to determine how to best accommodate [his] ongoing condition." At trial, Chin testified that at the time she set up the meeting, she knew Albano had restrictions in place since 2004, including that he could not work night shifts.

On December 6, Albano met with Chin and Chin's colleague at 10:00 a.m. Chin told Albano that because his restrictions prevented him from performing the duties of a police officer in the field, the department was going to "civilianize" his position.

---

[2] Albano testified that his hypertension was independent from his chronic fatigue syndrome. He had taken intermittent leaves of absence in 2018 due to high blood pressure.

"Civilianizing" refers to the reclassification of an officer to a civilian. LAPD policy required sworn officers to "civilianize" after they spent a certain amount of time on light-duty status. The policy applied to " '[a]ny employee who was injured on or after August 1st, 2006.' " Albano told Chin that the policy did not apply to him because he was placed on restricted duty in 2004. Chin said she would need to verify his date of injury. Albano described his condition to her and told her he was grateful that the LAPD had been willing to accommodate him. Albano left the meeting feeling "very emotional" and confused about why Chin was trying to determine how to "better accommodate" him when he was already being accommodated.

Chin did not follow up with Albano regarding his date of injury. Several hours after their meeting, Albano received an e-mail that Chin sent to the Harbor Division detectives' unit bidding " 'a very fond farewell to' " Albano and two others she indicated as " 'returning to patrol' " in the next deployment period. That evening, Albano received an automated e-mail to request days off for his next assignment, which the e-mail identified as the "Harbor Pat[rol] Watch 5 Desk Car" from December 23, 2018, to January 19, 2019.

On December 10, Willis called Albano to her office and informed him that the new Captain of Harbor Division, Greg McManus, had decided to eliminate the detectives' desk position and had assigned Albano to the "Watch 5 Patrol Desk." The shift began at 4:00 p.m. and ended at 2:00 a.m. Albano told Willis that night shift assignments violated his medical restrictions. He asked Willis about the Property Disposition Coordinator position. According to Albano, Willis said she had told McManus she had Albano "slated to fill that spot, and [McManus] didn't care. There

6

was no response." At trial, Willis confirmed that she told McManus about her intention to transition Albano to the Property Disposition Coordinator position.

Patricia Batts, a detective who supervised Albano, learned from Willis that Albano was being reassigned from the detectives' desk to a night shift desk in the Patrol division. Batts was aware of Albano's restrictions. She told Albano that McManus thought Albano "was faking an illness, that he wasn't really ill, and was a slacker and he wanted him back in patrol." She also told Albano that she did not understand why he was not being reassigned to the Property Disposition Coordinator position.

Albano testified that after he learned the department would no longer accommodate him, his hypertension and chronic fatigue went "through the roof," and he "started feeling more of the body ache and the burning that [he] typically fe[lt]. It became more intense." On December 11, he went to see his workers' compensation internist because his blood pressure was "dangerously high." The doctor found Albano "totally temporarily disabled" and placed Albano on medical leave until December 18. On December 14, Albano saw the doctor who treated his chronic fatigue syndrome for a prescheduled appointment. He explained to his doctor "what was going on" at work "and that it had exacerbated [his] chronic fatigue symptoms, the stress of it." His doctor wrote a note stating Albano was " 'having a major flare up of his chronic medical problems' " and placing him on leave until January 25, 2019.

Some of Albano's coworkers advised him that "since the department wasn't going to accommodate [him]," and he "was probably going to have to retire," he needed to start the retirement process. He "felt [he] had no alternative" and that the

7

department had engaged in "a concerted effort" to "target" him and "get rid" of him because he was a light-duty officer who could not be civilianized under the policy. Albano did not consider working the new night shift assignment because the hours "would [have] destroy[ed]" and "incapacitated" him. On December 18, Albano notified the department that he intended to retire in 2019.

From December 2018 through May 2019, Albano submitted a series of doctors' notes extending his leave of absence. No one from the LAPD contacted Albano to discuss his work restrictions or accommodations after he was reassigned to the night shift. Albano retired in June 2019 after 21-and-a-half years with the LAPD.

Learning about the LAPD's decision had triggered a "setback" in the incremental improvements in Albano's condition he had previously experienced. Albano described it as "going back to day zero." The LAPD's decision exacerbated his insomnia, stress, and anxiety. A unique symptom of his condition "is the burning. . . . [I]f you could picture yourself having an Indian burn like you use[d] to do when you were a kid over your entire body all day long, that's how I feel. The aching and the aching and then just the fatigue. [¶] So when something traumatic, something very stressful happens, it all flares up. It just triggers, you know. I can't take opioids. I can't take drugs . . . to get rid of it. It's just something I have to live with."

For Albano, "it was extremely depressing" and "extremely painful" that despite his performance, the LAPD had "take[n] the position of . . . [']we don't want him anymore.['] " At trial he testified: "Any career, that is your identity. And I enjoy helping people, I enjoyed being involved in that. I loved the camaraderie

8

with my coworkers and everything else. So it was a big hit, it was just a big hit." The LAPD's decision to stop accommodating him affected his family, due to "the lack of activity and lack of everything" that ensued as a result of the worsening of his condition. It upset his wife to see him "going back down . . . to day zero" and watching him "going back . . . through the stress and anxiety . . . of [his] career being taken away from [him]." He "was in bed just feeling horrible, frustrated . . . ."

Taking early retirement was also a difficult financial decision. Because Albano had not completed 25 years of service, he did not qualify for a deferred retirement program he had planned to participate in, he received a smaller percentage of his pension, and he did not qualify for the full medical subsidy. This caused Albano a "financial hardship" because he had to put his wife on his medical insurance after she was diagnosed with breast cancer six days after he retired.

In September 2020, Albano filed a complaint asserting five causes of action under the FEHA: (1) discrimination on the basis of his disability; (2) harassment on the basis of his disability; (3) retaliation; (4) failure to accommodate; and (5) failure to engage in the interactive process. He sought economic and noneconomic damages. Albano dismissed the discrimination, harassment, and retaliation causes of action before trial.

Albano's remaining causes of action for failure to accommodate and failure to engage in the interactive process proceeded to a jury trial. The jury did not find the City liable for failing to accommodate Albano but did find it liable for failing to engage in the interactive process. The jury awarded Albano no past or future economic damages, $700,000 in past noneconomic damages, and $300,000 in future noneconomic damages.

9

In January 2023, the City moved for a new trial on Albano's claim for failure to engage in the interactive process and on the jury's award of noneconomic damages. The City argued the evidence showed Albano failed to initiate the interactive process after he learned he was reassigned to a night shift position, and his medical leave in December 2018 foreclosed any opportunity for the Department to engage in the interactive process with him. The City also argued the evidence was insufficient to sustain the jury's damages award because the City had accommodated Albano until his retirement, and there was no finding it had engaged in retaliatory or malicious conduct. The City additionally contended a new trial was warranted because the jury returned an inconsistent verdict. The City asserted the jury's finding that the City failed to engage in the interactive process could not be reconciled with its finding that the City did not fail to provide Albano with a reasonable accommodation.

The court denied the City's motion. The court found the evidence establishing the LAPD reassigned Albano to a position violating his work restrictions without engaging in the interactive process "before, during, or after his position was changed" was "sufficient to support the jury's award of damages for failure to engage in the interactive process." The City timely appealed.

## DISCUSSION

I. **Substantial Evidence Supports the Jury's Finding that the City Failed to Engage in the Interactive Process**

A. **Standard of review**

"When a party contends insufficient evidence supports a jury verdict, we apply the substantial evidence standard of

10

review." (*Wilson v. County of Orange* (2009) 169 Cal.App.4th 1185, 1188.) " ' "[T]he power of [the] appellate court *begins* and *ends* with the determination as to whether there is any substantial evidence contradicted or uncontradicted which will support the [verdict]." [Citations.]' [Citation.]" (*Ibid.*)

" ' "In determining whether a judgment is supported by substantial evidence, we may not confine our consideration to isolated bits of evidence, but must view the whole record in a light most favorable to the judgment, resolving all evidentiary conflicts and drawing all reasonable inferences in favor of the decision of the trial court. [Citation.] We may not substitute our view of the correct findings for those of the trial court [or jury]; rather, we must accept any reasonable interpretation of the evidence which supports the [factfinder's] decision." ' [Citations.]" (*Frank v. County of Los Angeles* (2007) 149 Cal.App.4th 805, 816.) "Reversal for insufficient evidence is rare, as a party raising a claim of insufficiency of the evidence assumes a ' "daunting burden." ' [Citation.]" (*Padideh v. Moradi* (2023) 89 Cal.App.5th 418, 438.)

### B. Applicable legal principles

Under FEHA, an employer must make "reasonable accommodation" for employees with known disabilities unless doing so would impose an undue hardship. (§ 12940, subd. (m).) In making reasonable accommodations, employers must "engage in a timely, good faith, interactive process with the employee . . . to determine effective reasonable accommodations . . . ." (§ 12940, subd. (n).) "[A]n employer's failure to properly engage in the process is separate from the failure to reasonably accommodate an employee's disability and gives rise to an

11

independent cause of action [citation].” (*Swanson v. Morongo Unified School Dist.* (2014) 232 Cal.App.4th 954, 971.)

“ ‘ “[T]he interactive process requires communication and good-faith exploration of possible accommodations between employers and individual employees,” with the goal of “identify[ing] an accommodation that allows the employee to perform the job effectively.” [Citation.] . . . [F]or the process to work “[b]oth sides must communicate directly, exchange essential information and neither side can delay or obstruct the process.” [Citation.]’ ” (*Nadaf-Rahrov v. Neiman Marcus Group, Inc.* (2008) 166 Cal.App.4th 952, 984–985 (*Nadaf-Rahrov*).)

Once an employer becomes aware of the need for an accommodation, it has a continuing duty to engage in the interactive process. (*Zamora v. Security Industry Specialists, Inc.* (2021) 71 Cal.App.5th 1, 41 (*Zamora*).) “[T]he fact that the employer took some steps to identify a reasonable accommodation does not absolve the employer of liability for failure to engage in the interactive process if it is responsible for a later breakdown in the process.” (*Ibid.*)

### C.    Substantial evidence supports the jury’s verdict

Substantial evidence supports the jury’s finding that the City failed to engage in the interactive process despite its awareness of Albano’s chronic condition and light-duty restrictions.

It is undisputed that in 2004, Albano initiated the interactive process by requesting an accommodation for his work restrictions from his supervising lieutenant. After that time, Albano routinely provided doctors’ notes confirming the same light-duty restrictions, and he complied with the LAPD’s requirement that he submit to an examination by a City doctor in

2008.  In 2018, at a meeting Chin purportedly set to determine how to "best accommodate" Albano, he explained his condition, its effects on his health, and his medical treatments to Chin.  Yet, Chin did not inform Albano that the department was eliminating his position at the detectives' desk or attempt to discuss the availability of other accommodations with him.  Instead, hours after Albano made clear he could not be civilianized under the department's policies, he was reassigned to a night shift position in violation of a restriction the LAPD had been aware of for 14 years.  The jury could reasonably conclude that the LAPD bore responsibility for the breakdown in the interactive process, ongoing since 2004, by failing to inform Albano that his position was being eliminated, failing to discuss the availability of other light-duty positions, and, without warning or discussion, assigning him to a shift that Chin and the LAPD supervisors knew he could not perform because of his medical condition.

In *Nadaf-Rahrov*, *supra*, 166 Cal.App.4th 952, the court observed that the interactive process is "a back-and-forth process of *sharing* information about available jobs (on the employer's part) and physical limitations (on the employee's part)."  (*Id.* at p. 987.)  The City contends Albano's medical leave starting December 11, 2018, "brought the interactive process to a halt" because LAPD policy prohibited engaging in the interactive process until Albano resumed work.  Yet, the jury could reasonably conclude otherwise and determine the City halted the interactive process *before* Albano took leave.

The LAPD did not engage in any discussion with Albano to share that his position was being eliminated or evaluate his ability to perform other work.  The department had known of Albano's specific restrictions for years.  In contravention of these

13

restrictions, the LAPD unilaterally determined Albano could work a night shift position and reassigned him without any further discussion or inquiry. When Albano asked about an accommodation—the Property Disposition Coordinator position—two different supervisors told Albano that McManus did not believe his disability was genuine and refused to accommodate his restrictions.

The jury could reasonably conclude from this evidence that the LAPD abandoned its obligation to participate in the required "back-and-forth process of *sharing* information" and was therefore responsible for the breakdown in the interactive process. (*Nadaf-Rahrov, supra,* 166 Cal.App.4th at p. 987; *Zamora, supra,* 71 Cal.App.5th at p. 48 [jury could find employer's lack of communication and evidence of vacant positions led to breakdown in interactive process].) Indeed, the evidence supported the conclusion that by the time Albano went on medical leave, the interactive process was no longer available to him. (*Shirvanyan v. Los Angeles Community College Dist.* (2020) 59 Cal.App.5th 82, 98 [" ' "When two or more inferences can be reasonably deduced from the facts, the reviewing court is without power to substitute its deductions for those of the [trier of fact]." ' "].)

The City argues that after the department reassigned Albano to the night shift, he bore the burden of "initiat[ing] the interactive process" by contacting LAPD personnel about the violation of his restrictions. However, an employer's continuing obligation " 'extends beyond the first attempt at accommodation and continues . . . where the employer is aware that the initial accommodation is failing and further accommodation is needed.' " (*Scotch v. Art Institute of California* (2009) 173 Cal.App.4th 986,

14

1013 (*Scotch*).)  As stated above, it is undisputed that Albano initiated the interactive process in 2004, it was ongoing, and the LAPD was aware of his restrictions throughout his employment. Thus, once the LAPD knew it was eliminating the detectives' desk position, it had the continuing obligation to engage with Albano regarding alternatives.[3]  It did not do so.

The City's reliance on *Raine v. City of Burbank* (2006) 135 Cal.App.4th 1215 (*Raine*) is misplaced.  In *Raine*, after the police department learned the plaintiff's temporary disability was permanent, it engaged in the interactive process and concluded it could not offer an officer a permanent light-duty desk position as an accommodation without civilianizing him.  (*Id.* at pp. 1218– 1219.)  The officer declined to accept a civilian position and did not identify any other position he was qualified to perform as an officer.  (*Id.* at pp. 1219–1220 & fn. 2.)  At issue on appeal was whether the department failed to provide a reasonable accommodation by refusing to convert the officer's temporary light-duty position into a permanent one.  (*Id.* at pp. 1218–1221.) In affirming summary judgment for the city, the court found that the department was not required under FEHA to create a new position to accommodate the officer.  (*Id.* at p. 1227.)

_____

[3]     For the first time in its reply brief on appeal, the City argues that Albano's "totally temporarily disabled" status supported the conclusion that the interactive process would have been "futile."  We deem these arguments waived.  (*Paulus v. Bob Lynch Ford, Inc.* (2006) 139 Cal.App.4th 659, 685 (*Paulus*) ["Courts will ordinarily treat the appellant's failure to raise an issue in his or her opening brief as a waiver of that challenge."].) In any event, as explained above, it was reasonable for the jury to conclude that the LAPD failed to engage in the interactive process before Albano was deemed totally temporarily disabled.

15

The facts here are readily distinguishable. There was no evidence that the LAPD engaged in the interactive process after Albano informed Chin his condition was permanent. The LAPD did not give Albano the opportunity to request any specific accommodation. Chin described the department's attempt to civilianize Albano as part of a broader push to reduce the number of light-duty officers in the department, not an attempt to accommodate him. Further, no evidence suggested that had the interactive process occurred, Albano would have requested that his detective desk position be made a permanent accommodation. To the contrary, Albano was actively preparing to take over the Property Disposition Coordinator position after the current coordinator's retirement. *Raine* therefore provides no support for the City's position on appeal.

Likewise, the record refutes the City's argument that Albano could not prevail on his interactive process claim because he failed to identify a reasonable accommodation that would have been available to him during the interactive process.[4] There was substantial evidence that the Property Disposition Coordinator position was available to Albano as an accommodation at the time he spoke to Chin. Willis and Albano agreed that he would succeed the current coordinator, the position was "flexible" such

---

[4] In the trial court, the City argued a new trial was necessary because the jury's verdict was inconsistent. Although the City references an inconsistency in the jury's verdict in its reply brief, the City's opening brief does not argue for reversal based on an inconsistent verdict. We consider the argument abandoned, or, to the extent the City attempted to raise it in its reply brief, forfeited for the City's failure to develop the argument in its opening brief. The City cannot raise the argument for the first time in reply. (*Paulus*, *supra*, 139 Cal.App.4th at p. 685.)

16

that it accommodated Albano's restrictions, and Willis had taken steps to transition him into the role. Thus, Albano was "able to identify an available accommodation the interactive process should have produced" had the LAPD engaged in the interactive process with him before reassigning him to the night shift. (*Scotch, supra*, 173 Cal.App.4th at p. 1018; cf. *Miller v. Department of Corrections & Rehabilitation* (2024) 105 Cal.App.5th 261, 284 [affirming summary judgment for employer on interactive process claim in absence of evidence of available reasonable accommodation "had CDCR engaged in the interactive process to plaintiff's satisfaction"].)

## II. The Damages Award Is Supported by Substantial Evidence

The jury awarded Albano $700,000 in past noneconomic damages and $300,000 in future noneconomic damages. The City contends this award is excessive and not supported by substantial evidence. We disagree.

### A. Applicable legal principles and standard of review

"Noneconomic damages compensate an injured plaintiff for nonpecuniary injuries, including pain and suffering. Pain and suffering is a unitary concept that encompasses physical pain and various forms of mental anguish and emotional distress." (*Corenbaum v. Lampkin* (2013) 215 Cal.App.4th 1308, 1332.) "[A] plaintiff may recover not only for physical pain but for fright, nervousness, grief, anxiety, worry, mortification, shock, humiliation, indignity, embarrassment, apprehension, terror or ordeal." (*Capelouto v. Kaiser Foundation Hospitals* (1972) 7 Cal.3d 889, 892–893 (*Capelouto*).) "The jury must impartially determine pain and suffering damages based upon evidence

17

specific to the plaintiff . . . ." (*Loth v. Truck-A-Way Corp.* (1998) 60 Cal.App.4th 757, 764.)

"We review the jury's damages award for substantial evidence, giving due deference to the jury's verdict and the trial court's denial of the new trial motion." (*Bigler-Engler v. Breg, Inc.* (2017) 7 Cal.App.5th 276, 300 (*Bigler-Engler*).) " 'The amount of damages is a fact question, first committed to the discretion of the jury and next to the discretion of the trial judge on a motion for new trial. They see and hear the witnesses and frequently . . . see the injury and the impairment that has resulted therefrom. As a result, all presumptions are in favor of the decision of the trial court [citation].' " (*Id.* at p. 299, quoting *Seffert v. Los Angeles Transit Lines* (1961) 56 Cal.2d 498, 506–507 (*Seffert*).) " 'It must be remembered that the jury fixed these damages, and that the trial judge denied a motion for new trial, one ground of which was excessiveness of the award. These determinations are entitled to great weight. . . .' " (*Phipps v. Copeland Corp. LLC* (2021) 64 Cal.App.5th 319, 343 (*Phipps*).)

" 'The power of the appellate court differs materially from that of the trial court in passing on this question. An appellate court can interfere on the ground that the judgment is excessive only on the ground that the verdict is so large that, at first blush, it shocks the conscience and suggests passion, prejudice or corruption on the part of the jury.' [Citation.] ' "The question is not what this court would have awarded as the trier of fact, but whether this court can say that the award is so high as to suggest passion or prejudice." ' [Citation.]" (*Bigler-Engler, supra,* 7 Cal.App.5th at p. 299, quoting *Seffert, supra,* 56 Cal.2d at p. 507.)

## B.    Substantial evidence supports the jury's award

Substantial evidence of Albano's physical and mental anguish supports the jury's award.  Albano testified that the LAPD's decision not to accommodate him immediately affected his health.  His hypertension and chronic fatigue symptoms went "through the roof."  He suffered body aches and burning sensations, and his blood pressure was "dangerously high."  Albano's doctors concluded he was experiencing "a major flare up" and that his symptoms were so severe as to render him "totally temporarily disabled" and require him to take immediate medical leave, which was extended over several months.  Albano testified that he felt he had regressed to "day zero" of his illness, during which he was bedridden and in constant pain that was not treatable with medication.

Albano also testified to the emotional impact of the LAPD's refusal to accommodate his restrictions.  He testified the incident was "extremely depressing," "extremely painful," and caused him stress and anxiety.  His career had been his "identity," and the loss of purpose and camaraderie caused him to suffer "a big hit."  He testified that he "was in bed just feeling horrible, frustrated" and that his physical decline and emotional distress upset his wife.  Drawing all presumptions in favor of the award, and affording great weight to the factfinders' determinations below, we cannot conclude on these facts that the damages award suggests the jury was influenced by passion, prejudice, or corruption.

The City contends the past noneconomic damages award "amount[s] to a shocking windfall" of daily damages for Albano.  The City contends that the total $1 million award for "December 10, 2018 (when Albano was notified of his reassignment to the

19

Patrol Desk) to June 22, 2019 (when he voluntarily retired)" equals $5,200 in daily damages. The City appears to erroneously include the jury's award for future noneconomic damages in its calculation. The jury's $700,000 award for past noneconomic damages, divided over the same period, results in a daily damages amount of approximately $3,553 per day.

The parties dispute the relevant period covered by the jury's past noneconomic damages award. The City asserts the jury awarded damages up to the date of his retirement; Albano argues the relevant period ends on the day trial began. However, the jury was not instructed that noneconomic damages could only be awarded for harm Albano suffered before his retirement date. The jury could reasonably have awarded damages up to the date of trial, given the evidence that Albano continued suffering nonpecuniary injuries even after his retirement date. (See, e.g., *Briley v. City of West Covina* (2021) 66 Cal.App.5th 119, 141 (*Briley*) [evaluating amount of past noneconomic damages "covering a period of about three years between [plaintiff's] termination and the trial"]; *Colucci v. T-Mobile USA, Inc.* (2020) 48 Cal.App.5th 442, 460–461 (*Colucci*) [past noneconomic damages measured between termination and trial; future damages after trial concluded]; *Bigler-Engler*, *supra*, 7 Cal.App.5th at p. 300 [measuring past noneconomic damages from plaintiff's last medical procedure to time of trial].) The jury's award of $700,000 for past noneconomic damages between December 10, 2018—the day he learned he was no longer being accommodated—and the start of trial on November 15, 2022, amounts to a daily damages award of $487 per day. We cannot conclude this amount of daily damages "shocks the conscience."

We also reject the argument that the award is disproportionate to the level of noneconomic harm Albano suffered. The evidence established that Albano's physical condition severely declined after he learned that the LAPD would not accommodate him. He was "in bed" unable to engage in normal activities. His exacerbated condition led doctors to extend his medical leave for several months. His inability to work for the LAPD affected a core part of his identity, and his emotional distress affected his home life. Determinations about the extent and severity of Albano's injuries were within the jury's sole discretion, and his testimony was sufficient for the jury to conclude that he had and would suffer significantly. "[W]e do not reassess the credibility of witnesses or reweigh the evidence." (*Westphal v. Wal-Mart Stores, Inc.* (1998) 68 Cal.App.4th 1071, 1074.)

The City contends that "Albano's self-serving, subjective, and completely uncorroborated testimony," unsupported by other expert or lay testimony, is insufficient to show that his deteriorating health in December 2018 was attributable to the City's conduct and not his preexisting condition. However, a "plaintiff's own testimony commonly establishes his damages for pain and suffering . . . ." (*Capelouto*, *supra*, 7 Cal.3d at p. 895.) Expert testimony is not required to support a claim for noneconomic damages. (*Ibid.*)

Here, Albano testified that stress was a major trigger for his symptoms. His physical health worsened significantly one day after he learned that the LAPD was reassigning him to a night shift position because the commanding officer believed he was faking his symptoms. Albano testified that the LAPD's questioning of his condition caused stress that had similarly

21

aggravated his symptoms in 2008. Further, while Albano was not an expert, he had lived with his condition for 18 years at the time of trial and could competently describe the triggers for his illness based on his years of experience and the changes in the severity of his symptoms. The City has not established that this was the kind of case that required expert testimony to link the plaintiff's pain and suffering to the LAPD's conduct. (See, e.g., *Knutson v. Foster* (2018) 25 Cal.App.5th 1075, 1099 [in dicta suggesting expert testimony "would be required to the extent a plaintiff's damages are alleged to have arisen from a psychiatric or psychological disorder caused or made worse by a defendant's actions and the subject matter is beyond common experience"].)

A jury could reasonably conclude from Albano's testimony that the LAPD's conduct was a substantial factor in causing the significant and sudden exacerbation in his condition, and that the increased severity of his symptoms and attendant emotional distress warranted a considerable damages award.[5]

To the extent the City urges this court to compare the jury's award here to those in other cases, we agree with courts that have found comparing verdicts to be of limited utility given the fact-specific nature of the damages inquiry. (*Fernandez v. Jimenez* (2019) 40 Cal.App.5th 482, 490–491.) " [W]e adhere to

---

[5] The City also contends that Albano's counsel made statements in closing argument that impermissibly asked the jury to award damages to punish the City rather than make Albano whole. The record on appeal does not contain the transcript of the closing arguments as the City did not designate it for inclusion. We therefore presume the record supports the judgment. (*Hearn v. Howard* (2009) 177 Cal.App.4th 1193, 1200 ["it is the appellant's burden to furnish a record adequate for review"].)

22

the previously announced and historically honored standard of reversing as excessive only those judgments which the entire record, when viewed most favorably to the judgment, indicates were rendered as the result of passion and prejudice on the part of the jurors.' " (*Id*. at p. 491, quoting *Bertero v. National General Corp.* (1974) 13 Cal.3d 43, 65, fn. 12.)

In any event, the City's other cited authorities do not compel the conclusion that the damages award was excessive in this case. For example, in *Briley*, *supra*, 66 Cal.App.5th 119, a jury awarded a deputy fire marshal $3.5 million in past and future noneconomic damages for whistleblower retaliation. (*Id*. at pp. 124–127, 139.) The court reversed the award, in part because the plaintiff had not testified to physical symptoms "beyond his unspecified sleep-related issues" after termination. (*Id*. at p. 142.) The court found this insufficient to sustain $1,700 in daily damages. (*Ibid*.) In contrast, here, Albano testified to both the physical effects of the significant exacerbation of his condition after the LAPD reassigned him to the night shift position and to the emotional distress of losing his position with the LAPD.

*Horsford v. Board of Trustees of California State University* (2005) 132 Cal.App.4th 359, is also inapposite. In *Horsford*, the Court of Appeal *affirmed* the trial court's reduction of damages after finding the trial court's conclusion that the harm "was less severe than it (impliedly) appeared to the jury" was supported by the evidence. (*Id*. at p. 389.) The trial court here found substantial evidence *supported* the jury award, and we afford that conclusion great weight. (*Phipps*, *supra*, 64 Cal.App.5th at p. 343.)

Finally, the City challenges the jury's award of future noneconomic damages because no evidence established Albano's harm was reasonably certain to occur in the future. There is no established definition of " 'reasonable certainty.' " (*Colucci*, *supra*, 48 Cal.App.5th at p. 460.) However, a jury may conclude harm is reasonably certain to occur in the future "based on all the evidence and relying upon its own experiences and common knowledge, that the future harm is reasonably certain to occur." (*Ibid*.)

Here, substantial evidence established that Albano's distress from the LAPD's conduct was reasonably certain to occur in the future. Albano testified that the stress caused by the LAPD's conduct triggered a significant setback in his condition that continued to cause him daily physical pain. He also testified to the mental anguish he felt after losing his identity as a police officer and his camaraderie with his colleagues. Albano also testified that ending his career three-and-a-half years early created financial stress because of the reduced pay and benefits. (Cf. *Briley*, *supra*, 66 Cal.App.5th at p. 143 [future noneconomic damages not supportable where economic damages award "should have eliminated any remaining financial concerns tied to his termination from the City"].) From this evidence, the jury could rationally find Albano proved with reasonable certainty that he would endure noneconomic damages in the future resulting from the department's failure to engage in the interactive process.

## DISPOSITION

The judgment is affirmed.  Respondent to recover his costs on appeal.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

ADAMS, J.

We concur:

EDMON, P. J.

EGERTON, J.